*1171
 
 OPINION
 

 Per Curiam:
 

 Appellant Sharmarlo Tinch was convicted of first degree murder with the use of a deadly weapon and conspiracy to commit murder, both with gang enhancements, for the drive-by shooting and murder of a rival gang member. Tinch appeals his conviction on the grounds that a mistrial should have been granted because one juror allegedly told the bailiff, prior to being polled, that she wished to change her verdict to not guilty and because the State violated the rules of discovery. Tinch further asserts that evidence of his prior bad acts was erroneously introduced at trial.
 

 FACTS
 

 Omar Walls testified for the State at Tinch’s trial. According to Walls, on February 28, 1994, he saw Tinch shoot and fatally injure Kentral “Boobie” Washington in a gang-related shooting. Washington and Walls were members of the “Comstock 40s” street gang, and Tinch was a member of a rival gang, the “Rolling 60s.” Walls testified that he and Washington were talking on Lawry Street near the corner of Comstock Street in Clark County; at approximately 1:00 p.m., Walls noticed a white
 
 *1172
 
 four-door Honda make a U-turn on Comstock Street and then turn onto Lawry Street.
 

 According to Walls, Tinch was sitting on the Honda’s passenger side door with his upper body outside of the Honda. Tinch made a Rolling 60s gang sign as the car first passed Washington and Walls, who responded with a Comstock 40s gang sign.
 
 [1]
 
 As the Honda drove by again after making its U-turn, Tinch fired a gun at Walls and Washington; Walls started firing a gun at the Honda and ran across the street while Washington hid behind a car parked in front of a house on the corner. The Honda then made another U-turn and pulled up in front of the house where Washington was hiding. Walls stated that Tinch then began shooting at Washington, who moved from behind the parked car and began running across the corner house’s yard. Tinch killed Washington with a gunshot to the neck.
 

 Another Comstock 40s gang member, Tony McCullum, testified that he was about half a block away from where Washington and Walls had been talking on Lawry Street. McCullum claimed to have seen the white Honda pull up in front of the corner house where Washington was hiding; McCullum saw Tinch, who was sitting on the passenger side door of the Honda, aim and fire a handgun. McCullum then saw Washington lying on the ground in the area where Tinch had fired.
 

 Timothy Crane testified for the defense as an alibi witness. Crane stated that Tinch had been with him at Crane’s girlfriend’s house almost the entire day of the shooting. According to Crane, Tinch came to his girlfriend’s house between 9:30 and 10:00 a.m., so that Crane could cut Tinch’s hair. Tinch left at approximately 11:00 a.m. and returned at approximately 12:15 p.m. Crane claimed that sometime after Tinch returned, he overheard a neighbor say that someone had been shot.
 

 During cross-examination of Crane, the State attempted to impeach him with an earlier handwritten statement wherein Crane had listed February 26, 1994, rather than February 28, 1994, as the date that he had been with Tinch. The defense objected on the grounds that, in violation of discovery rules, it had not received the statement, and the State indicated that it was unaware that the defense had not received a copy. The trial court ruled that the State would not be permitted to use Crane’s written statement because it had not been provided to the defense. The defense then called Crane’s girlfriend, LaTonya Houston. Houston testified that when she came home on February 28, 1994, at 2:00 p.m., Tinch was sleeping at her home. Houston
 
 *1173
 
 stated that she was sure of the date because it was the same date she had gone to get her child’s social security card and the “Geraldo” show was on the television.
 

 At the beginning of trial, the State attempted to introduce several of Tinch’s prior uncharged acts. The trial court allowed evidence of the following two incidents. Approximately two weeks before the shooting, Walls, McCullum, and another friend were walking when Tinch and several others drove by in the white Honda involved in the shooting. Words were exchanged between the two groups and gang signs were “flashed.” The second incident occurred the following day; Washington, Walls, and another Comstock 40s gang member were in Rolling 60s “turf.” Tinch saw the three Comstock 40s gang members and shot at them as they ran away.
 

 On September 14, 1995, the jury convicted Tinch of one count of murder with the use of a deadly weapon with the intent to promote, further, or assist a criminal gang and conspiracy to commit the same. The jury was polled'after the verdict was read, and all members supported the verdict. However, the following week one of the jurors, Ms. Grieve, contacted the trial court’s secretary and stated that the verdict of guilty was not her verdict. Prior to the penalty phase, the district court held an evidentiary hearing to address the issue. At the hearing, Grieve told the court that she had been the only juror who thought Tinch should be acquitted and that she did not agree with the guilty verdict. Apparently, the first verdict forms had been filled out incorrectly, so the jury went back to correct the forms. According to Grieve, before returning to the courtroom for the second time, she “asked [the bailiff] ... if I could change [the verdict]. He says no.”
 

 The bailiff testified that the following occurred:
 

 [BAILIFF]: The second time we went back to the jury room to change the forms, as we were coming into the courtroom, [Grieve] indicated, what if I change my mind? And I says, well, we have to go in now.
 

 So we came in. And my — in retrospect I should have immediately went to the judge and told him that. However, I did not do so. But after the jury was polled, I thought [Grieve] would speak up.
 

 THE COURT: Did you tell her that she couldn’t change her verdict?
 

 [BAILIFF]: I didn’t say she could not change her verdict. I told [Grieve] we have to go in now. This is when we were coming in.
 

 [PROSECUTOR]: Was it after that that she then was polled and said that was her verdict? ... In other words,
 
 *1174
 
 after this conversation with you, then [Grieve] came into court and the verdict was read?
 

 [BAILIFF]: Exactly.
 

 [PROSECUTOR]: And that’s when [Grieve] stood up— the defense or the judge had each of the jurors stand up and asked if that was their verdict, and she said that was her verdict?
 

 [BAILIFF]: That’s correct.
 

 The testimony further indicated that although Grieve stated upon being polled that her verdict was guilty, Grieve was crying at the time.
 
 [2]
 
 At the close of the evidentiary hearing, Tinch moved for a mistrial based upon Ms. Grieve’s testimony. Following a subsequent hearing, the trial court denied Tinch’s motion for mistrial. After the penalty phase, Tinch was sentenced to life with the possibility of parole, plus an identical consecutive term for the deadly weapon enhancement, concurrent with six years for the conspiracy conviction plus six years consecutive for the conspiracy gang enhancement.
 

 Tinch now appeals the lower court’s denial of his motion for mistrial based upon Ms. Grieve’s testimony and the State’s failure to provide Tinch with Crane’s handwritten statement. Tinch further challenges the district court’s decision to admit evidence of Tinch’s prior uncharged acts. We conclude that Tinch’s arguments are without merit and affirm his convictions and sentences.
 

 DISCUSSION
 

 The district court did not err in denying the motion for mistrial based on Grieve’s testimony or the State’s alleged discovery violation
 

 There is a factual dispute as to the nature of the dialogue between Grieve and the bailiff which occurred on the jury’s way into the courtroom to deliver its verdict on the corrected forms. Grieve testified that she told the bailiff that she wanted to change her verdict, and the bailiff told her that she could not. According to the bailiff, Grieve simply asked what would happen if she changed her mind, and he responded that she had to go into the courtroom at that time.
 

 As a general rule, jurors may not impeach their own verdict. Pinana v. State, 76 Nev. 274, 288, 352 P.2d 824, 832 (1960).
 
 *1175
 
 Accordingly, it was incumbent upon Grieve to repudiate her verdict when polled by the court. Tinch asserts that the fact that Ms. Grieve supported the verdict when polled is irrelevant because the bailiff had told her that she could not change her verdict. However, the district court apparently adopted the bailiff’s account of what transpired. It is not this court’s prerogative to determine the credibility of witnesses below. Doyle v. State, 112 Nev. 879, 891-92, 921 P.2d 901, 910 (1996). Therefore, we conclude that the district court’s failure to declare a mistrial on the basis of Ms. Grieve’s testimony was not error.
 

 Tinch further asserts that a mistrial should have been granted because the State violated the rules of discovery by failing to produce Crane’s witness statement. Even though the district court decided that the State could not use Crane’s handwritten statement to impeach him as Tinch’s alibi witness, Tinch asserts that the jury nonetheless heard that Crane may have earlier stated that he was with Tinch on February 26, 1994, rather than February 28, 1994 — the day of the shooting. Tinch contends that a mistrial was the only appropriate remedy because the State suppressed or intentionally withheld information from the defense.
 

 In Lopez v. State, 105 Nev. 68, 79, 769 P.2d 1276, 1283 (1989), we concluded that the trial court did not err in denying a defense motion for mistrial where there was no evidence of suppression or that the State intentionally withheld information from the defense. Tinch has not shown any intentional or bad faith suppression by the State; the prosecutor responded to Tinch’s initial objection with a statement that he “wasn’t aware that counsel didn’t have it.” Accordingly, we conclude that the trial court did not err in denying a mistrial based on the State’s alleged discovery violation.
 
 [3]
 

 The district court did not err in admitting evidence of two prior, uncharged acts
 

 Finally, Tinch contends that evidence of two prior incidents, which occurred two weeks before the murder (i.e., Tinch flashing gang signs at Walls and McCullum and firing a gun at Washington the next day), was improperly admitted. We disagree. The trial court conducted a hearing outside of the presence of the jury on
 
 *1176
 
 the State’s motion in limine to introduce several uncharged acts against Tinch.
 
 [4]
 
 To be deemed an admissible bad act, the trial court must determine, outside the presence of the jury, that: (1) the incident is relevant to the crime charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.
 
 [5]
 
 Walker v. State, 112 Nev. 819, 824, 921 P.2d 923, 926 (1996).
 

 We conclude that the evidence was relevant to the gang enhancement charge and could show motive pursuant to NRS 48.045(2). Further, the testimony of McCullum and Walls concerning these prior incidents provided clear and convincing evidence of the occurrence of the prior acts. With regard to whether the evidence was overly prejudicial, Tinch argues that it simply “inflame[d] the passions of the jury to convict a man based upon his status as [a] gang member.” We disagree. “Other state and federal courts have found gang-affiliation evidence relevant and not substantially outweighed by unfair prejudice when it tends to prove motive.” Lay v. State, 110 Nev. 1189, 1196, 886 P.2d 448, 452 (1994) (concluding that gang affiliation evidence was not unfairly prejudicial and was relevant to show motive to shoot rival gang members). Accordingly, we conclude that the trial court did not err in permitting the State’s introduction of Tinch’s prior uncharged acts.
 

 CONCLUSION
 

 We conclude that the district court properly refused to grant a mistrial based upon the juror’s claim that the verdict was not her own and the alleged discovery violations. We further conclude that Tinch’s remaining argument concerning the admission of prior bad acts is without merit. Accordingly, Tinch’s convictions and sentences are affirmed.
 

 [1]
 

 There was testimony that the flashing of gang signs is a form of intimidation, used to “represent your neighborhood.”
 

 [2]
 

 The court responded that Ms. Grieve “was crying . . . before she even went out to deliberate — while she was deliberating or whatever. I mean, none of that is unusual. It happens all the time where people get emotional during the stress of trying to decide upon a verdict.”
 

 [3]
 

 Tinch farther asserts, very briefly, that the State “sandbagged” the defense by failing to introduce two of its eyewitnesses until after the jury was empaneled. Tinch’s argument is cryptic, at best, and no authority in support of this argument is cited. We will not address this issue.
 
 See
 
 McKinney v. State, 93 Nev. 70, 71, 560 P.2d 151, 151 (1977).
 

 [4]
 

 Tinch objected that the State’s motion was untimely because it waited almost a week after calendar call to file the motion. However, Tinch has not provided this court with any support for his untimeliness argument; therefore, we will not consider this issue.
 
 McKinney,
 
 93 Nev. at 71, 560 P.2d at 151.
 

 [5]
 

 We acknowledge that some of our prior cases have misstated this third prong as “the evidence is more probative than prejudicial.”
 
 See, e.g.,
 
 Cipriano v. State, 111 Nev. 534, 541, 894 P.2d 347, 352 (1995); Berner v. State, 104 Nev. 695, 697, 765 P.2d 1144, 1146
 
 (1988).
 
 These cases are modified to reflect the correct standard as set forth in this opinion.