LERLENE EVONNE ROEVER, APPELLANT, v. THE STATE OF NEVADA, Respondent.

No. 29647

September 2, 1998                                    963 P.2d 503

*Harry R. Gensler,* Public Defender, and *Harold Kuehn,* Assistant Public Defender, Nye County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Robert S. Beckett,* District Attorney, and *Kirk D. Vitto,* Deputy District Attorney, Nye County, for Respondent.

## OPINION

By the Court, YOUNG, J.:

Appellant Lerlene Evonne Roever ("Roever") was previously convicted of one count of first degree murder of her boyfriend, Ian Wilhite ("Wilhite"), and one count of possession of a controlled substance, marijuana. On appeal, we reversed Roever's conviction and remanded for a new trial. Roever v. State, 111 Nev. 1052, 901 P.2d 145 (1995).

At Roever's second trial, the jury again returned a guilty verdict for first degree murder and possession of marijuana. The district court sentenced her to two consecutive terms of life in prison with the possibility of parole for the murder count and one year in prison for the possession count.

Roever and Wilhite lived together in a trailer home in Pahrump, Nevada, with Roever's three children. On the morning of January 16, 1993, Roever called the police to report that she had found Wilhite lying dead in their master bedroom. The cause of death was attributed to a single bullet found in the base of his skull. The medical examiner determined that Wilhite was shot while sleeping the previous night and that the wound was not self-inflicted. Roever told police that she and Wilhite had argued about his infidelities the previous evening and that she spent the night on the couch in the living room of the trailer. She also told police that she had not heard any noise the night before.

Although Roever possessed a handgun, the police recovered only an empty handgun box. Further, because the bullet fragments

were severely damaged, the medical examiner could not determine the type of bullet or firearm used in the murder.

Roever was arrested and charged with murder and possession of a controlled substance. Her theory of defense to the murder charge was that an unknown third party entered the trailer during the night, murdered Wilhite, and left the residence and its environs without being seen. The State's theory of the case was that Roever was the only person with a possible motive and opportunity to shoot Wilhite.

At trial, the parties stipulated to playing a videotaped interview between Roever and Detective Frank Ruas ("Detective Ruas") during the State's case-in-chief. The interview was replete with self-serving statements by Roever. Thereafter, also during its case-in-chief, the State called a series of character witnesses who testified to numerous prior statements allegedly made by Roever and to prior acts in which she was allegedly involved.

Roever argues on appeal that the following testimony was improperly admitted over objection and without a hearing required by Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985):

1. Marlene Chidester, Roever's neighbor, testified that Roever had described in detail how she murdered her mother in a bathtub and watched her mother's teeth float in the water, that she had snapped her newborn baby's neck, and that she had scalped an African-American schoolgirl and cut out her teeth while Roever was experiencing a blackout.

2. Dominick Roever, Roever's son, testified that Roever and her ex-husband, Craig Bruske ("Bruske"), would fight violently and once she attacked Bruske with a knife.

3. Gloria and William Lambert, Roever's acquaintances, each testified that Roever had told them that she "gutted an ex-beau."

4. Bruske testified that Roever killed a classmate and has a personality disorder causing her to speak in different voices, experience blackouts, and forget what happened to her. Bruske further testified that Roever drank excessively, neglected her children, and tried to kill him with a knife.

5. Wanda Harrer, Bruske's mother, testified that Roever once threatened a woman in a bar with a cue stick.

6. Carole Kay Phillips ("Phillips"), Roever's employer, testified that Roever was a thief and a liar.

7. Yolanda Wilhite Connelly, Wilhite's sister, testified that Roever once bit Wilhite.

The State contends that Roever called her character into question when she stated during her taped interview with Detective Ruas that she was "a peace-loving person, who would not hurt a fly and whose credibility should not be questioned." Therefore, the State asserts that the bad act testimony was admissible under NRS 48.045(1)(a) as rebuttal character evidence. The State also

alleges that the evidence was admissible under NRS 48.045(2) to establish that Roever had committed criminal acts while experiencing a blackout and that she was capable of concocting fantastic or incredible stories.

Initially, the bad character testimony should never have been introduced because it was not in rebuttal to a defense made by the accused. NRS 48.045(1)(a) permits admission of character evidence when the defendant offers his or her good character into evidence and the prosecution introduces evidence to rebut the defense. However,

> " '[b]efore an issue can be said to be raised, which would permit the introduction of such evidence so obviously prejudicial to the accused, it must have been raised in substance if not in so many words, and the issue so raised must be one to which the prejudicial evidence is relevant. . . . The prosecution cannot credit the accused with fancy defences in order to rebut them at the outset with some damning piece of prejudice.' " McCormick on Evidence § 190 at 452 n.54 (Edward W. Cleary, 2d ed. 1972) (quoting Lord Sumner in Thompson v. The King, App. Cas. 221, 232 (1918)).

Taylor v. State, 109 Nev. 849, 854, 858 P.2d 843, 846-47 (1993). Here, Roever did not use her videotaped statements as evidence of her good character to be rebutted by the State. We reject the State's contention that Roever "opened the door" to character rebuttal merely by stipulating to the admission of the videotape; it was, in fact, the State that first used the tape in its case-in-chief. Therefore, we conclude that the district court erred by allowing the State to rebut character evidence that had not yet been presented by the accused.

Second, NRS 48.055 allows permissible character evidence to be admitted at trial only in the form of the witness's opinion of the defendant or the defendant's reputation. Evidence of specific acts is admissible only upon cross-examination or when the defendant's character is an essential element of the charge. The testimony presented here was clearly not in the proper form. Further, the State concedes that it did not confront Roever on the witness stand under NRS 48.055 with the specific instances of conduct and statements under scrutiny. Accordingly, the testimonial evidence at issue was improperly admitted as rebuttal character evidence, pursuant to NRS 48.045(1)(a) or NRS 48.055.

Third, we conclude that the evidence was improperly admitted

pursuant to NRS 48.045(2). NRS 48.045(2) proscribes evidence of other acts to prove character, although such evidence is offered for other purposes. The district court is required to conduct a hearing to determine whether evidence of other acts is admissible. At the hearing, the court must determine whether "(1) the incident is relevant to the crime charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." Tinch v. State, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997). A trial court's determination to admit or exclude such evidence will not be disturbed on appeal absent manifest error. *Petrocelli,* 101 Nev. at 52, 692 P.2d at 508.

Even had the district court conducted the required hearing prior to admitting the bad act evidence, this evidence should still have been excluded. Much of the bad act evidence admitted was so inflammatory, speculative, and utterly fantastic as to bear practically no probative value. Moreover,

> "[t]he use of uncharged bad acts to convict a defendant is heavily disfavored in our system of criminal justice. Such evidence is likely to be prejudicial or irrelevant, and forces the accused to defend himself against vague and unsubstantiated charges. . . . Evidence of uncharged misconduct may unduly influence the jury, and result in a conviction of the accused because the jury believes he is a bad person. . . . The use of specific conduct to show a propensity to commit the crime charged is clearly prohibited by Nevada law, . . . and is commonly regarded as sufficient grounds for reversal."

*Taylor,* 109 Nev. at 854, 858 P.2d at 847 (quoting Berner v. State, 104 Nev. 695, 696-97, 765 P.2d 1144, 1145-46 (1988)). Accordingly, even if clear and convincing evidence established the existence of these acts and the acts were relevant to the crime charged, we conclude that any probative value was substantially outweighed by the danger of unfair prejudice as a matter of law. *Tinch,* 113 Nev. at 1176, 946 P.2d at 1064-65.

Fourth, the State alternatively argues that the testimonial evidence in dispute could properly be used to impeach Roever, who testified on her own behalf. We conclude that this argument is without merit because NRS 50.085 permits such impeachment only as it relates to the witness's propensity for truthfulness or untruthfulness. Only portions of Phillips' testimony discussed Roever's propensity toward untruthfulness and, therefore, could properly be used as impeachment against Roever if she testifies again and her testimony is in the proper form. Such impeachment

may be admitted only in the form of an opinion. NRS 50.085(1). Any specific acts cannot be raised through extrinsic evidence. NRS 50.085(3). The prior acts at issue here were generally not used to demonstrate Roever's propensity toward untruthfulness, and the State impermissibly used extrinsic evidence by calling other witnesses to testify about those acts. Consequently, this evidence, with the exception of some of Phillips' testimony, was not proper impeachment.

We conclude that the prior bad act evidence was improperly admitted and served only to violate Roever's fundamental right to a fair trial. Accordingly, we must reverse her conviction and remand this matter for a new trial. In light of this conclusion, we need not address Roever's other contentions to this court.

SPRINGER, C. J., and ROSE, J., concur.

SHEARING, J., concurring:

I agree that Roever should be granted a new trial. However, I do not agree with all of the majority's analysis of the testimony of Marlene Chidester, Gloria and William Lambert, and Craig Bruske. Roever's taped statement that she was ''a peace-loving person who would not hurt a fly,'' was introduced into evidence by stipulation. I would hold that this statement would have opened the door to evidence of Roever's prior inconsistent statements through the testimony of Chidester, the Lamberts and possibly Bruske. This would have been appropriate impeachment and admissible, not for the truth of the matter asserted, but as bearing on her credibility.

The fact that the evidence ordinarily would not have been admissible because it related to character, does not mean that it cannot be used to impeach the defendant. In U.S. v. Lara, 956 F.2d 994 (10th Cir. 1992), the court admitted evidence of another pending prosecution against defendant, over the objection that other bad act evidence should not have been admitted. However, the defendant had testified that he had never been arrested and had never been prosecuted for anything else. The Tenth Circuit affirmed the conviction saying:

> The defendant's testimony could reasonably be taken as an assertion that the indictment in the instant case was the only trouble he had ever had with the law. This answer was misleading in light of the fact that the defendant was at the time under indictment in another case. Evidence of the other prosecution was not introduced to show the defendant's bad character. Rather, it was used to challenge the truthfulness of his testimony. Rule 404(b) [comparable to NRS 48.045(2)] shields a defendant from unfair prejudice but it is not a license to give misleading or false testimony. Under the cir-

cumstances, the use of this evidence for impeachment was a permissible "other purpose" under Rule 404(b). *Cf.* United States v. Stockton, 788 F.2d 210, 219 n. 15 (4th Cir.) (Impeachment may qualify as a permissible use of prior bad acts under Rule 404(b)), *cert. denied,* 479 U.S. 840, 107 S. Ct. 147, 93 L.Ed.2d 89 (1986).

Roever's statements that she was peace-loving came in on tape, and Roever was never asked about the statements she had made. Before extrinsic evidence of prior inconsistent statements may be introduced, the witness must be afforded an opportunity to explain or deny the statements. NRS 50.135(2)(b).

Of course, the evidence must also be tested under NRS 48.035(1) to determine whether its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury. This is a determination to be made by the trial judge.

MAUPIN, J., concurring:

I agree that admission of the purported "character" rebuttal warrants retrial of this matter. I write separately to comment further on the State's use of this evidence.

*Admissibility of character evidence under NRS 48.045*

At trial, during the State's case in chief, the parties stipulated to playing a taped interview between Roever and Detective Frank Ruas. The interview was replete with self-serving statements by Roever that, in my view, placed her good character in issue. Thereafter, also during its case in chief, the State called a series of rebuttal "character" witnesses who testified to numerous statements allegedly made by Roever and to separate prior incidents in which she was allegedly involved.[1] These include alleged statements by Roever that she had (1) murdered her mother in a bathtub and watched her mother's teeth float in the water; (2) snapped her newborn baby's neck; (3) scalped an African-American school girl and cut out her teeth during a blackout; (4) "gutted" her exboyfriend and (5) threatened to kill the victim in this case on several occasions. There was further testimony on "character rebuttal" that she had killed a classmate, suffered from a personality disorder, experienced blackouts, drank excessively, neglected her children, and tried to kill her former spouse with a knife.

NRS 48.045(1) articulates the general rule regarding the admissibility of character evidence in the context of a criminal trial:

---

[1]Upon inquiry at oral argument, Roever's counsel indicated that, in light of the stipulation allowing her statement to be admitted as a defense exhibit and played during the State's case in chief, the chronological order of the presentation of the alleged inadmissible evidence was not at issue on appeal.

 1. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

 (a) Evidence of his character or a trait of his character offered by an accused, and similar evidence offered by the prosecution to rebut such evidence . . . .

The State contends that Roever placed her character at issue when she stated during her taped interview with the police that she was "a peace-loving person, who would not hurt a fly and whose credibility should not be questioned." At oral argument, the State asserted that the "bad acts" testimony was admissible under NRS 48.045(1)(a) as rebuttal character evidence and under NRS 48.045(2), to establish that Roever had committed criminal acts while "blacked out" and that she was capable of concocting fantastic or incredible stories. Under these theories, the district court allowed the State to rebut Roever's character evidence with statements and conduct to which we now refer.[2] Here, although I conclude that Roever placed her character in issue by stipulating to the admission of the tape, I also conclude that the "rebuttal evidence" was improperly admitted.

NRS 48.055 provides the available mechanism for proving character under NRS 48.045:

 1. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or in the form of an opinion. On cross-examination, inquiry may be made into specific instances of conduct.

 2. In cases in which character or a trait of character of a person is an essential element of a charge, claim or defense, proof of specific instances of his conduct may be made on direct or cross-examination.

NRS 48.045 and NRS 48.055(1) mirror Federal Rules of Evidence 404 and 405. With the exception of allowing opinion testimony in addition to reputation testimony to establish character, Federal Rules of Evidence 404 and 405 adopt traditional common law principles of admissibility of character evidence. At common law, specific instances of conduct were not admissible to prove the good character of an accused or to prove bad character in rebuttal. *See* Falknor, *Extrinsic Policies Affecting Admissibility*, 10 Rutgers L. Rev. 574, 584 (1956) (referred to in committee

---

[2]Although the State conceded at oral argument that the evidence given by Chidester, Mr. and Mrs. Lambert and Bruske was introduced to rebut Roever's evidence of good character and not for impeachment via "prior bad acts," the State has argued in the alternative, in its brief, that admissibility could also be based on such grounds.

notes to FRE 404 and 405). NRS 45.045(2) codifies this principle.[3] Thus, the legislative history of these provisions confirms that such character evidence should be limited to opinion or reputation. Here, the State concedes that it did not confront Roever on the witness stand with the specific instances of conduct and statements now under scrutiny. Thus, with the exception of the threats to Wilhite and, possibly, the evidence of attempts to murder her former spouse, *see* NRS 48.045(2) and Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985), the district court improperly allowed the State to introduce the aforementioned evidence.[4]

Even if there was a doctrinal basis for the admissibility of this "character" evidence, its introduction would also run afoul of the district court's discretion under NRS 48.035[5] because much of this evidence was so inflammatory, speculative and utterly fantastic as to have almost no probative value absent some independent corroboration.

I also agree, subject to the exceptions noted above, that the alleged statements and specific instances of conduct were not admissible under NRS 48.045(2) for the "other purposes" of proving that she had committed acts of violence during blackouts, or that she was capable of concocting fantastic or incredible stories. Again, under NRS 48.035, the probative value of this evidence, i.e., to prove that she could have perpetrated the murder without a specific recollection of having done so, was speculative at best. Further, if this evidence was calculated to prove her capability to fabricate, it was of marginal relevance as well as patently prejudicial. Thus, even if a hearing had been conducted under Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985),[6] it would

---

[3]NRS 48.045(2):

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[4]*See* footnote No. 10 for exceptions to this ruling, including the evidence of threats Roever made against Wilhite prior to his demise.

[5]NRS 48.035(1) states: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury."

[6]The State has argued in its brief and at oral argument that the need to conduct a *Petrocelli* hearing was obviated because the State did not seek admission of the extraneous evidence in question for other purposes such as motive, intent, etc. This contradicts the State's arguments that the evidence was also probative to prove that Roever had blackouts and was capable of concocting incredible stories. NRS 48.045(2) is implicated when specific instances of conduct are used for purposes other than character "such as" motive or intent, etc. The rule is not restricted to the exceptions which are noted in the statute by way of example.

Further, the State has repeatedly taken the position in this matter that the

have been improper to admit this evidence. *See* Tinch v. State, 113 Nev. 1170, 946 P.2d 1061 (1997).[7]

The State also sought affirmance on the basis that the offending character evidence was admissible to attack Roever's credibility under NRS 50.085.[8] *See* NRS 48.045(1)(c).[9] However, character impeachment must be limited to opinions regarding truthfulness or untruthfulness. *See* NRS 50.085(1)(a), (b). As noted, the State introduced specific acts of misconduct through the testimony of third parties. Thus, the character impeachment in question was not limited to opinions.

Further, there was no attempt to bring these statements and alleged incidents into the case through cross-examination of Roever herself. Thus, the specific instances of conduct of which Roever complains on appeal, if introduced as "prior bad acts" to attack Roever's credibility, were introduced extrinsically in violation of NRS 50.085(3):

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime, may not be proved by extrinsic evidence. They may, however, if relevant to truthfulness, be inquired into on cross-examination of the witness himself or on cross-

defendant's failure to ask for such a hearing precludes her from arguing the point on appeal. This argument underscores an apparent lack of understanding of the process. While it is true that the failure to hold such hearings does not always prejudice fundamental rights so as to warrant reversal, it is generally the burden of the State to bring matters implicating NRS 48.045(2) to the attention of the trial court.

[7]This court has established the following prerequisites before prior bad acts evidence can be admitted: "(1) the incident is relevant to the crime charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." *Tinch*, 113 Nev. at 1176, 946 P.2d at 1064-65 (citing Walker v. State, 112 Nev. 819, 824, 921 P.2d 923, 926 (1996)).

[8]NRS 50.085 states in part:

    1. Opinion evidence as to the character of a witness is admissible to attack or support his credibility but subject to these limitations:
        (a) Opinions are limited to truthfulness or untruthfulness; and
        (b) Opinions of truthful character are admissible only after the introduction of opinion evidence of untruthfulness or other evidence impugning his character for truthfulness.
    2. Evidence of the reputation of a witness for truthfulness or untruthfulness is inadmissible.

[9]NRS 48.045(1)(c):

    1. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

    . . . .

    (c) Unless excluded by NRS 50.090, evidence of the character of a witness, offered to attack or support his credibility, within the limits provided by NRS 50.085.

examination of a witness who testifies to an opinion of his character for truthfulness or untruthfulness, subject to the general limitations upon relevant evidence and the limitations upon interrogation and subject to the provisions of NRS 50.090.

NRS 50.085.[10] Here, Roever may have been subject to impeachment through cross-examination with regard to the bad acts discussed by the majority, assuming a good faith basis to inquire into them and assuming the interrogation would not violate NRS 48.035. The State, however, (1) chose not to confront her directly with the extraneous events, and (2) the extrinsic proof of them was improper with or without confrontation.[11]

I now turn to the possibility that the errors committed might be subject to a harmless error analysis. I reject adoption of such an alternative, despite persuasive circumstantial evidence suggesting that Roever is the only person who could have committed the murder of Ian Wilhite. Although the evidence of Roever's guilt seems quite strong, the errors with regard to the so-called character rebuttal are so profound that our utilization of the harmless error doctrine would set a most dangerous precedent. Thus, I would urge the State to exercise restraint in its next attempt to seek a conviction.

---

[10]Such a ruling would not compel exclusion of all of the statements and incidents attributed to Roever. By way of example, her threats against Wilhite voiced to third persons, including Lambert; her statements to Chidester shortly after the killing to the effect that "she knew how to take care of people who got in her way"; her statements regarding disagreements with Wilhite; any statements regarding how Wilhite died or the facts leading up to his death; and references to her daughter's diary on cross-examination of the daughter. These must be separately evaluated with regard to other rules of evidence, including, but not limited to, NRS 48.035.

On retrial, if Roever places her character in issue, Chidester, Mr. and Mrs. Lambert and Bruske could testify as character witnesses in rebuttal within the confines of this court's rulings and, I believe, the views set forth in this separate opinion. Then, specific positive instances of conduct by Roever could be explored on their cross-examinations, and specific negative instances could be explored on Roever's cross-examination, if she testifies.

[11]Under NRS 50.085(3), had Roever been specifically confronted with the extraneous events alleged by these witnesses, her denial of them would not have opened the door to their admission under the traditional approach taken in NRS 50.085. However, under a modern doctrine of "specific contradiction," a doctrine we have yet to embrace, a witness may be subject to "collateral" impeachment by contradictory evidence from third parties. Although this case is not appropriate for an examination of such a rule, we should, in an appropriate future case, examine whether witnesses should be insulated from false testimony under the "extrinsic evidence" rule of NRS 50.085(3).