STEVEN SAMUEL BRAUNSTEIN AKA STEVEN SAMUEL JALBERT, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 35968

February 13, 2002 40 P.3d 413

ROSE, J., dissented in part.

*Marcus D. Cooper,* Public Defender, and *Drew R. Christensen,* Deputy Public Defender, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, and *James Tufteland,* Chief Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, AGOSTI, J.:

Appellant Steven Samuel Braunstein was convicted by a jury of two counts of sexual assault of a minor under the age of fourteen and two counts of lewdness with a child under the age of fourteen.

We conclude that (1) the district court did not abuse its discretion in admitting evidence of one prior act of molestation committed by Braunstein; (2) although a trustworthiness hearing must be held before the admission of a child-victim's hearsay statements, failure to conduct such a hearing does not necessarily require reversal, and in this case, reversal is not warranted; (3) the district court did not err in denying Braunstein's motion for a new trial where the jury returned guilty verdicts for both sexual assault and lewdness; and (4) sufficient evidence supports Braunstein's conviction.

### FACTS

On June 14, 1999, Braunstein was charged with two counts of sexual assault upon a minor under fourteen years of age. The victim, J.P., was born November 17, 1990. Braunstein pleaded not guilty at his arraignment.

Prior to trial, the district court ruled that the State was entitled to offer evidence of a prior molestation, allegedly committed by Braunstein, of another young female, A.M. Trial commenced January 18, 2000.

J.P.'s mother testified at trial that she met Braunstein and became his friend in 1992. Braunstein's daughter, K.B., who is four years older than J.P., had been injured in a horse-riding accident in 1996 and was left with severe brain damage. J.P.'s mother would watch K.B. in Braunstein's absence, and Braunstein became accustomed to watching J.P.

J.P. testified that Braunstein began touching her inappropriately when she was four years old. She testified that he touched her in

the "wrong places" by putting his hand under her panties and placing his fingers inside her vagina. She testified that she did not tell any adults because she was afraid that Braunstein would hurt her. She also testified that she told her cousin about these incidents when she was four years old. Her cousin testified that J.P. was about five years old when she first confided in her. J.P. would cry when telling her cousin about these incidents.

In January 1999, J.P.'s mother became involved with the Girl Scouts organization, which required her to attend administrative meetings during which she left J.P. alone with Braunstein. J.P. testified to instances of sexual assault that occurred while her mother was away from the home attending these meetings.

On May 14, 1999, the evening before they planned to vacation at Disneyland, J.P. and her mother stayed the night at Braunstein's home. On this occasion, J.P. testified that she was climbing and jumping on Braunstein's back while he lay on his stomach. She testified that this helped his back to feel better when it hurt. J.P.'s mother was not present in the room at the time. J.P. testified that while she was clothed in a long t-shirt and underwear, Braunstein digitally penetrated her. She testified that the experience was painful. Early the next day, on the way to Disneyland, J.P. told her mother about the incident, but her mother did not believe her.

On May 20, 1999, J.P. told her school counselor, Nancy Gentis, about the May 14 incident. Gentis had previously taught a sexual abuse awareness class at J.P.'s school. Gentis reported the incident to the police. Gentis testified as to her involvement and also as to the statements J.P. made to her concerning Braunstein's conduct. The jury also heard the testimony of J.P.'s cousin, who testified to statements made to her by J.P. over the course of three years, all concerning Braunstein's conduct.

On May 27, 1999, J.P. was examined by Phyllis Suiter, a board-certified pediatric and family nurse practitioner at SAINT (Sex Abuse Investigative Team), a program designed to perform examinations on suspected child-victims. Suiter testified that her physical examination of J.P. revealed clear evidence of a penetrating injury that could only have been caused by sexual abuse.[1]

The jury also heard testimony concerning a prior bad act by Braunstein. A.M. testified that between June and October 1997, when she was thirteen years old, Braunstein repeatedly made sexual advances toward her. A.M. testified that she frequently babysat Braunstein's daughter, K.B. A.M. testified to several incidents where Braunstein touched her inappropriately, put ice into her underpants and retrieved it, frisked her, and touched her breasts. On one occasion, A.M. was playing on the computer at

---

[1]Evidence was also introduced that showed that Dr. Marc O'Connor had examined J.P. five years earlier for suspected sexual abuse, but that the examination revealed no indication of sexual abuse.

Braunstein's home when Braunstein, who was alone with her at the time, accessed some pornographic materials and made repeated sexual comments to her. At the same time, Braunstein touched A.M.'s vagina through her clothes and fondled her breasts.

The jury ultimately returned guilty verdicts on both sexual assault counts and on two lesser included counts of lewdness with a minor under the age of fourteen.[2] After the district court had excused the jury, Braunstein objected that the verdicts were inconsistent. Braunstein also moved for a new trial. After hearing arguments, the district court struck the convictions for the two counts of lewdness.

On March 14, 2000, the district court sentenced Braunstein to two consecutive prison terms of life with parole eligibility after twenty years. The judgment was entered on March 17, 2000, and Braunstein filed this timely appeal on April 13, 2000.

## DISCUSSION

Braunstein first argues that the district court improperly admitted A.M.'s testimony. Braunstein argues that the district court did not explicitly determine the relevance of the evidence, state specifically why the evidence was clear and convincing, and only slightly referenced the probative value of the evidence. In addition, Braunstein argues that the incident was not similar to those with which he was charged.

The trial court's determination to admit or exclude evidence of prior bad acts is a decision within its discretionary authority and is to be given great deference. It will not be reversed absent manifest error.[3] We conclude that the district court, after conducting a hearing outside the presence of the jury, did not abuse its discretion in admitting A.M.'s testimony.

The general rule for admitting evidence of prior bad acts is set forth in NRS 48.045(2).[4] In determining whether such acts are admissible, the district court must conduct a hearing and determine whether "(1) the incident is relevant to the crime charged;

---

[2]Braunstein asked for and received an instruction on these two counts as lesser-included offenses of sexual assault.

[3]*See Qualls v. State,* 114 Nev. 900, 902, 961 P.2d 765, 766 (1998).

[4]NRS 48.045(2) states:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice."[5]

This court has generally held inadmissible prior acts that are remote in time and involve conduct different from the charged conduct.[6] This court has stated that the use of uncharged bad acts is heavily disfavored and is likely to be prejudicial or irrelevant.[7] Prior bad act evidence forces the accused to defend himself against vague and unsubstantiated charges and may result in a conviction because the jury believes the defendant to be a bad person.[8] Thus, using uncharged bad acts to show criminal propensity is forbidden and is commonly viewed as grounds for reversal.[9]

We perceive no error in the district court's decision to admit A.M.'s testimony. In so ruling, however, we specifically do not rely upon and today repudiate the legal proposition stated in *McMichael v. State*[10] that evidence showing an accused possesses a propensity for sexual aberration is relevant to the accused's intent.

In *McMichael,* the court quoted a 1956 Arizona case, *State v. McDaniel,* for the proposition that

> "[c]ertain crimes today are recognized as stemming from a specific emotional propensity for sexual aberration . . . . Even granting the general rule of inadmissibility of evidence of independent crimes to prove the offense charged, many courts recognize a limited exception in the area of sex crimes to prove the nature of the accused's specific emotional propensity."[11]

The *McMichael* court then noted that "in sex crimes generally a more liberal judicial attitude exists in admitting evidence of prior

---

[5]*Tinch v. State,* 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997).

[6]*Roever v. State,* 114 Nev. 867, 872, 963 P.2d 503, 506 (1998) (in a case involving a woman's murder of her husband, testimony recounting the defendant's prior violent behavior toward others and stories of extraordinary past murders was "so inflammatory, speculative, and utterly fantastic as to bear practically no probative value"); *Beck v. State,* 105 Nev. 910, 912, 784 P.2d 983, 984 (1989) (in a case involving a high school teacher's sexual assault of one of his students, testimony by another student victim regarding a bad act that occurred sixteen years earlier was deemed to be irrelevant as it involved a different bad act and was too remote in time).

[7]*Roever,* 114 Nev. at 872, 963 P.2d at 506.

[8]*Id.*

[9]*Id.*

[10]94 Nev. 184, 189, 577 P.2d 398, 401 (1978), *overruled on other grounds by Meador v. State,* 101 Nev. 765, 711 P.2d 852 (1985).

[11]*Id.* (quoting *State v. McDaniel,* 298 P.2d 798, 802-03 (Ariz. 1956)).

and subsequent proscribed sexual conduct.''[12] In *McMichael,* we upheld the trial court's decision to admit evidence of other acts committed by the accused upon the complaining witness. In *McMichael,* the trial court had analyzed the admissibility of the offered evidence by careful application of NRS 48.045(2). The trial court had determined that the evidence was admissible because it was probative of the issues of intent and absence of mistake or accident. Resort by the *McMichael* court to *McDaniel* was as unnecessary as its conclusion that no abuse in the admission of the evidence had occurred ''since the acts were similar, were committed within a period immediately preceding and following the instant offense, *and involved sexual aberration.*''[13]

We note that *McDaniel* was decided well before the promulgation of the first draft of the Federal Rules of Evidence.[14] This case represents a common law approach that Nevada abandoned when the Legislature enacted into law the evidence code. NRS 48.045(2) is patterned after the relevant section of the first draft of the Federal Rules of Evidence and was enacted in 1971 and therefore governed when *McMichael* was decided. The only appropriate analysis of the evidence in *McMichael* was by application of NRS 48.045(2).[15] We question whether the statute's reference to the admissibility of other crimes, wrongs or acts for ''other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident'' should include the purpose of proving a ''propensity for sexual aberration.''[16] Evidence of such a propensity sounds much

---

[12]*Id.*

[13]*Id.* at 190, 577 P.2d at 402 (emphasis added).

[14]The first draft of the proposed Federal Rules of Evidence was circulated in 1969. *See* Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, Preliminary Draft of Proposed Rules of Evidence (U.S. Government Printing Office, 1969). In 1970, a proposed evidence code was circulated for the State of Nevada which relied heavily upon and was substantially identical to the 1969 federal draft. *See* Legislative Commission of the Legislative Counsel Bureau, A Proposed Evidence Code, Bulletin No. 90 (Nev. 1970). In turn, Nevada's proposed evidence code was passed into law with only minor changes in 1971. 1971 Nev. Stat., ch. 402, at 775 (providing for the harmonization and codification of Nevada's law on evidence (Act of April 22, 1971)). Ultimately, the 1969 draft of the Federal Rules of Evidence was revised and promulgated by the United States Supreme Court in 1973. H.R. Doc. No. 93-46, pt. 7 (1973). By adopting the 1969 draft, Nevada enacted laws governing evidence which, while similar for the most part to the Federal Rules of Evidence, also contain significant differences from the federal rules.

[15]Nevada has not enacted statutes similar in any way to Federal Rules of Evidence 413 and 414 which were added to the Federal Rules of Evidence in 1994.

[16]*Compare* NRS 48.045(2), *with McMichael,* 94 Nev. at 190, 577 P.2d at 402.

more like the kind of inadmissible, bad character evidence prohibited by NRS 48.045(1).

The "doctrine" of *McMichael* was extended out of its context in *Findley v. State*,[17] where the court cited *McMichael* for the proposition that "[e]vidence showing that an accused possesses a specific emotional propensity for sexual aberration is relevant, *and outweighs the prejudicial possibility that a jury might convict for general rather than specific criminality.*"[18] Stated in this way, it appears the court determined as a matter of law that prejudice is outweighed by relevance whenever other act evidence of sexual aberration is considered for admission. This language and logic have persisted in our jurisprudence and, in our opinion, unnecessarily so. This court now abandons *McMichael, Findley* and their progeny and returns to an analysis of evidence of other sex crimes according to the parameters of NRS 48.045(2). We specifically overrule the legal proposition enunciated in *Findley* that evidence of other acts offered to prove a specific emotional propensity for sexual aberration is admissible and that, when offered, it outweighs prejudice. In so doing we ensure that the trial courts will always properly weigh the probative value of the evidence against the risk that the defendant will be unfairly prejudiced by its admission.

Here, the district court conducted a proper hearing outside the presence of the jury and concluded that the State had established the prior bad act by clear and convincing evidence. The court heard A.M.'s testimony and was presented with evidence that Braunstein had been convicted of a crime in connection with his actions against A.M. The district court determined that the prior bad act was relevant to prove a common scheme or plan[19] and was proximate in time and that its admission was not substantially outweighed by the danger of unfair prejudice. We cannot say that the district court's decision was manifestly erroneous. The admission of the testimony was a proper exercise of the district court's discretion which we will not disturb.

Braunstein's second argument is that the district court's failure to hold a pretrial hearing to determine the trustworthiness of J.P.'s

---

[17]94 Nev. 212, 577 P.2d 867 (1978).

[18]*Id.* at 215, 577 P.2d at 868 (emphasis added) (citing *McDaniel,* 298 P.2d 798).

[19]This other act evidence is, in our view, also admissible to establish Braunstein's motive. The district court found the act was also admissible pursuant to *McMichael* and *Findley.* Today, we reject the notion that other act evidence is admissible to establish a specific emotional propensity for sexual aberration.

hearsay statements warrants automatic reversal. The State argues that the hearsay statements were properly admitted in spite of the district court's failure to hold a pretrial hearing regarding their admissibility. The State asks this court to clarify its previous decisions concerning this issue and adopt a flexible approach that would allow this type of error to be reviewable as harmless error. We conclude that the approach urged by the State is consistent with this court's recent pronouncements. The requirement that the district court conduct a trustworthiness hearing before admitting the hearsay statements of a child-victim of sexual assault is found in NRS 51.385, which provides in relevant part:

> 1. In addition to any other provision for admissibility made by statute or rule of court, a statement made by a child under the age of 10 years describing any act of sexual conduct performed with or on the child or any act of physical abuse of the child is admissible in a criminal proceeding regarding that act of sexual conduct or physical abuse if:
>
> (a) The court finds, in a hearing out of the presence of the jury, that the time, content and circumstances of the statement provide sufficient circumstantial guarantees of trustworthiness; and
>
> (b) The child testifies at the proceeding or is unavailable or unable to testify.[20]

This court previously concluded in *Quevedo v. State*[21] and *Lytle v. State*[22] that irrespective of lack of objection by opposing counsel or confrontation of the victim at trial, failure to hold a "trustworthiness" hearing pursuant to NRS 51.385 warrants reversal and requires a new trial. Both *Quevedo* and *Lytle* involved testimony from adults relating to statements made to them by the child-victims. The victims testified in both cases. Both cases were 3-2 decisions, and neither *Quevedo* nor *Lytle* involved a confession by the defendant.

While *Quevedo* and *Lytle* each applied a strict rule of automatic reversal for the violation of NRS 51.385, this court has also applied a harmless error analysis in a similar situation.

In *Brust v. State,*[23] the hearsay statements consisted of the victim's own videotaped statements to a psychologist.[24] The child-victim had already testified and been cross-examined when the

---

[20]The Legislature amended NRS 51.385(1) during the 2001 legislative session. 2001 Nev. Stat., ch. 136, § 1, at 702. Because those amendments do not affect our decision, we have quoted the amended version of the statute.

[21]113 Nev. 35, 37, 930 P.2d 750, 751 (1997).

[22]107 Nev. 589, 591, 816 P.2d 1082, 1083 (1991).

[23]108 Nev. 872, 839 P.2d 1300 (1992).

[24]*Id.* at 877, 839 P.2d at 1303.

tape was introduced.[25] Furthermore, the defendant had confessed to molesting the victim.[26] In considering the defendant's confession and the fact that the district court had heard the victim's testimony before the hearsay statements were introduced, this court reasoned that while the district court erred in not holding a "trustworthiness" hearing, it was harmless error under those particular circumstances.[27] This court distinguished that case from *Lytle,* noting that the district court in *Brust* knew what to expect from the videotape interview; hence, the statements were merely repetitive.[28] In *Lytle,* the district court admitted hearsay statements from five separate witnesses without prior knowledge of the content of their testimony.[29]

More recently, in *Lincoln v. State,*[30] we held that the district court's failure to hold a trustworthiness hearing was error, but the error was harmless. *Lincoln* was distinguished from *Lytle* and *Quevedo* on the bases that the hearsay statements in question were tape-recorded and the victim testified and was subject to cross-examination.[31]

Factually, this case could be decided under either *Brust* and *Lincoln,* or *Lytle* and *Quevedo.* The analysis under *Brust* and *Lincoln* acknowledges that a harmless error analysis applies and contradicts the bright line rule of inadmissibility if a trustworthiness hearing is not held, as decided in *Lytle* and *Quevedo.*

We hold today that the failure to conduct a trustworthiness hearing under NRS 51.385 does not warrant automatic reversal and that this error is subject to a harmless error analysis. We expressly overrule our prior holdings in *Lytle* and *Quevedo* which yield a different result and endorse the more reasoned approach offered by *Brust* and *Lincoln.*

When applying a harmless error analysis to hearsay statements admitted without a hearing as required by NRS 51.385, the question of prime importance is whether or not the child to whom the hearsay statements are attributed testified at trial. If the child did testify and was subject to cross-examination, then no useful purpose is served by requiring, as urged by the dissent, automatic reversal. An inquiry into the harm caused by the error is more appropriate. We do not share the dissent's concern that only rarely

---

[25]*Id.*

[26]*Id.* at 874, 839 P.2d at 1301.

[27]*Id.* at 877, 839 P.2d at 1303.

[28]*See id.* at 876-77, 839 P.2d at 1303.

[29]*See Lytle,* 107 Nev. at 590, 816 P.2d at 1083.

[30]115 Nev. 317, 988 P.2d 305 (1999).

[31]*Id.* at 321, 988 P.2d at 307.

will non-compliance with the hearing requirement result in a reversal. Indeed, we do not rule that whenever a victim testifies and is subject to cross-examination the failure to hold the required trustworthiness hearing is always harmless error. We would not foreclose an argument in the future that despite the victim's testimony at trial, the admission of hearsay statements attributed to the victim constituted error resulting in prejudice to the defendant. We agree that if the child does not testify, then admission of hearsay attributed to the child should be thoroughly and carefully scrutinized at a hearing outside the jury's presence. The district courts, we are confident, will conduct such hearings, and if by inadvertence they do not, we will weigh the defendant's inability to conduct a cross-examination in our analysis of whether the error was harmless.

Here we conclude that the district court erred by failing to hold a trustworthiness hearing; however, the error was harmless. Numerous indications of reliability surrounded the admitted statements. First, J.P. made her statements to Nancy Gentis on her own accord and just six days after the incident with Braunstein. The statements made to Gentis were consistent with statements J.P. made to her cousin and her mother. Second, the statements made by J.P. to her cousin, uttered over the course of three years, were described by her cousin as being said while J.P. was emotionally upset and sometimes crying. J.P.'s described mental condition while she made her statements to her cousin seems very appropriate to the circumstances and is an indication of credibility. No evidence was offered to show that J.P. had any motive to fabricate such statements. Furthermore, the statements introduced through the testimony of either Gentis or J.P.'s cousin were consistent with J.P.'s in-court testimony. Because she was fully cross-examined by defense counsel, Braunstein was not deprived of his opportunity to test her credibility concerning these statements.[32]

Braunstein's third argument is that the district court improperly denied his motion for a new trial on the ground that the jury returned an inconsistent verdict. Braunstein objects to the jury's guilty verdicts for both lewdness and sexual assault.

We conclude that the district court properly determined that Braunstein cannot be convicted of both lewdness and sexual assault. The crimes of sexual assault and lewdness are mutually exclusive offenses.[33]

---

[32]With regard to the testimony of J.P.'s cousin, Braunstein failed to object to her testimony at trial. Therefore, Braunstein failed to preserve the issue for appeal. *See Lord v. State,* 107 Nev. 28, 38, 806 P.2d 548, 554 (1991).

[33]*See Townsend v. State,* 103 Nev. 113, 120, 734 P.2d 705, 710 (1987).

NRS 200.366(1) defines sexual assault as follows:

> A person who subjects another person to sexual penetration, or who forces another person to make a sexual penetration on himself or another, or on a beast, against the will of the victim or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of his conduct, is guilty of sexual assault.

NRS 201.230 defines lewdness, in relevant part, as the willful and lewd commission of:

> any lewd or lascivious act, *other than acts constituting the crime of sexual assault,* upon or with the body, or any part or member thereof, of a child under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of that child.

(Emphasis added.)

Here, the lewdness statute excludes from its definition "acts constituting the crime of sexual assault."[34] The crimes of sexual assault and lewdness are mutually exclusive and convictions for both based upon a single act cannot stand. This court has consistently held that when a defendant receives multiple convictions based on a single act, we will reverse "redundant convictions that do not comport with legislative intent."[35] We decline Braunstein's request that we revisit our prior jurisprudence in this area. We, therefore, conclude that the district court properly struck Braunstein's convictions for lewdness and properly denied Braunstein's motion for a new trial.

Braunstein's final argument is that there is insufficient admissible evidence to support his sexual assault convictions. We conclude that ample evidence was presented to support the jury's verdict.

In reviewing evidence supporting a jury's verdict, this court must determine whether the jury, acting reasonably, could have been convinced beyond a reasonable doubt of the defendant's guilt by the competent evidence.[36] Where conflicting testimony is presented, the jury determines what weight and credibility to give it.[37] We ask, " '[W]hether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could

---

[34]NRS 201.230.

[35]*Albitre v. State,* 103 Nev. 281, 283, 738 P.2d 1307, 1309 (1987).

[36]*Wilkins v. State,* 96 Nev. 367, 374, 609 P.2d 309, 313 (1980).

[37]*Bolden v. State,* 97 Nev. 71, 72, 624 P.2d 20, 20 (1981).

have found the essential elements of the crime beyond a reasonable doubt.' "[38]

Here, the jury heard compelling evidence presented by J.P., her mother, her school counselor, her cousin, and others that established that Braunstein had sexually assaulted her. The jury also heard testimony that a physical examination of J.P. showed clear evidence of a penetrating injury to her hymenal tissue. More than sufficient evidence existed to support the jury's verdict.

## CONCLUSION

We conclude that the district court did not err in admitting evidence of Braunstein's prior bad acts. The district court's failure to hold a trustworthiness hearing is not grounds for automatic reversal, and the district court's failure to hold such a hearing was harmless. The district court properly denied Braunstein's motion for a new trial. Finally, sufficient evidence supports the jury's verdict. Accordingly, we affirm Braunstein's convictions.

SHEARING, LEAVITT and BECKER, JJ., concur.

MAUPIN, C. J., with whom YOUNG, J., agrees, concurring:

I agree that the judgments of conviction in this matter should be affirmed.

I disagree, however, that this court should overturn *Findley v. State*[1] and *McMichael v. State*[2] as authority for the proposition that evidence showing that an accused poses a propensity for sexual aberration may be relevant in prosecutions for sexual assault. In this, I believe that both cases formulate a rule that is consistent with the exceptions to the general rule of non-admissibility of "other crimes, wrongs or acts" under NRS 48.045(2) as proof of character.

ROSE, J., concurring in part and dissenting in part:

Accusations of child sexual assault are often hard to disprove, even when a defendant is factually innocent. The majority strips yet another procedural safeguard from anyone accused of this crime[1] and reverses a decade of precedent in the process.

---

[38]*Koza v. State,* 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).

[1]19 Nev. 212, 214, 577 P.2d 867, 868 (1978).

[2]94 Nev. 184, 188, 577 P.2d 398, 401 (1978), *overruled on other grounds by Meador v. State,* 101 Nev. 765, 711 P.2d 852 (1985).

[1]In *Koerschner v. State,* 116 Nev. 1111, 13 P.3d 451 (2000), this court recently eliminated the requirement that a person accused of child sexual assault be provided the assistance of a psychiatrist or psychologist if the State uses such an expert witness in its prosecution. As I stated in my concurrence

NRS 51.385 requires that a district judge hold a hearing outside the presence of the jury to determine the reliability of a hearsay statement made by a child under the age of ten before admitting the statement into evidence for the jury's consideration. In several cases, we have held that the law should be enforced as written and that it is mandatory to hold a reliability hearing before admitting these hearsay statements.[2] There are good reasons for the law and our holdings in *Lytle* and *Quevedo*.

First, there is always a concern that a witness can perceive and accurately relate what has been seen, felt, or heard; and this is especially true when children testify. Hearsay statements of children are usually testified to at trial by a parent, relative, health care provider, or law enforcement officer. Not only is the reliability of the child's recollection of concern, but the motives of and influences on the adult repeating the child's testimony in court are also relevant to the reliability determination. It is not uncommon for an adult testifying about a child's statements to be angry at the accused or to have a financial interest in the balance. A reliability hearing determines if the repeated child's statements as testified to by an adult are sufficiently trustworthy to be admitted in evidence.

Second, NRS 51.385 is an exception to the general rule that prohibits hearsay testimony. An exception to a general rule should be strictly construed.[3] The repeated statements of a child are often critical in a child sexual assault case and often damning to the defendant—should not such important testimony that is ordinarily excluded be at least tested for reliability as required by the law before it is presented to the jury?

Finally, the law itself is a directive, stating that a reliability hearing shall be held before child hearsay statements are admitted. We should not lightly reject the legislature's concern for the reliability of this type of testimony as well as jettison our prior precedents in the process.

We have held in two cases that a harmless error analysis is appropriate when the child hearsay statements are those of the child on a videotape.[4] We reasoned that the tape of the testimony was already in the possession of the district court and presumably

to *Koerschner,* our previous rule providing for an accused to get the same expert assistance as the State in the absence of compelling reasons to protect the child-victim provided for a trial that was fair to both parties. The *Koerschner* decision eliminated this requirement, and, in my opinion, stripped the defendant of an important procedural safeguard.

[2]*Lytle v. State,* 107 Nev. 589, 591, 816 P.2d 1082, 1083 (1991); *Quevedo v. State,* 113 Nev. 35, 38, 930 P.2d 750, 751 (1997).

[3]*See generally* 73 Am. Jur. 2d *Statutes* § 313 (1974).

[4]*Lincoln v. State,* 115 Nev. 317, 988 P.2d 305 (1999); *Brust v. State,* 108 Nev. 872, 839 P.2d 1300 (1992).

reviewed by the district judge and parties. In both cases, the child-victim testified and had been cross-examined. The tapes were in large measure a repeat of the previous live testimony. Another consideration in those cases was that the victim's own statements were on the tape recordings, not those of another person recollecting what the child-victim told him or her as is the case here. Three members of the majority recognized and approved this very exception to the previously existing general rule, a general rule that they now reject.

I too have precious little sympathy for adults who sexually assault children, but we should keep the process to determine guilt a fair and balanced one. We should save our condemnation of the accused until after he or she is proven guilty, not remove safeguards provided by the Legislature and previously approved by this court before guilt is established.

I am also concerned about the practical effect of subjecting all violations of NRS 51.385 to the harmless error rule. This court seldom finds an error not to be cured by the harmless error test. As a practical matter, the standard will now be that hearsay statements of children are admissible regardless of compliance with NRS 51.385, and it will only be the rare case that is reversed for non-compliance. When NRS 51.385 is violated in the future, this court will be compelled to search the record, as we have done in this case, to find that guilt was overwhelming or to find that the statements were reliable so that we may conclude that any error was harmless.

In effect, NRS 51.385 is written out of the law by the majority opinion. A better process would be to require the district attorneys and the district judges to comply with the law as written or retry the case—the approach this court had taken during the past decade.

I do agree with the majority's insightful rejection of *McMichael v. State* and its progeny,[5] that have supported the admission of evidence showing an accused's propensity for sexual aberration to establish his intent.

Therefore, I respectfully concur in part and dissent in part, and would reverse this case based on our prior precedents.

---

[5]94 Nev. 184, 577 P.2d 398 (1978), *overruled on other grounds by Meador v. State,* 101 Nev. 765, 711 P.2d 852 (1985).