ROBERT LINZY BELLON, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 41984

August 11, 2005                                117 P.3d 176

*David M. Schieck,* Special Public Defender, and *Lee Elizabeth McMahon,* Deputy Special Public Defender, Las Vegas, for Appellant.

*Brian Sandoval,* Attorney General, Carson City; *David J. Roger,* District Attorney, *James Tufteland,* Chief Deputy District Attorney, and *Nathan A. Crane,* Deputy District Attorney, Clark County, for Respondent.

Before ROSE, GIBBONS and HARDESTY, JJ.

## OPINION

*Per Curiam:*

Robert Linzy Bellon appeals from his judgment of conviction. Bellon was sentenced to a term of life imprisonment without the possibility of parole, with an equal and consecutive term for the use of a deadly weapon.

Bellon argues on appeal that the district court erred by admitting the testimony of Louisiana police officers regarding threats that Bellon made against them after his arrest.[1] Bellon argues that the statements do not properly fall within the res gestae exception permitting the admission of such evidence. We agree and conclude that the district court abused its discretion by admitting the arresting officers' testimony. In addition, we conclude that the error was not harmless and therefore reverse Bellon's conviction and remand for a new trial.

### FACTS AND PROCEDURAL HISTORY

On October 8, 1995, the victim, Frank Troy Dunlap, Jr., left his mother's house in Las Vegas planning to visit relatives. He wore his Rolex watch and carried a Taurus 9mm handgun. At some point in the afternoon, Dunlap arrived at the home of his relative, Hilda Blaylock, who shared her home with two men named Rodney

---

[1]Bellon asserts several additional claims that we need not discuss given our decision. Bellon contends the district court erred by: (1) allowing the victim's mother, a witness in the case, to remain in the courtroom after Bellon invoked the exclusionary rule, in violation of his Sixth Amendment right to an impartial jury; (2) granting the State's motion in limine precluding Carmel Gadsen's testimony regarding Bellon's statements after the murder; and (3) giving the statutorily required reasonable doubt instruction. Additionally, Bellon maintains that the State engaged in prosecutorial misconduct by misstating facts to the jury about Bellon's statements to officers in Louisiana, resulting in prejudice to the defense.

Crosby and Lorenzo Elliot. Bellon and Everett Andre Flowers, aka Benzo, arrived at the residence at approximately the same time as the victim. The group planned to "hang out" and "kick it" for the evening.

After an evening of drinking, including multiple trips to the store to get beer, the group discussed going to the Crazy Horse club to see a friend who worked there. Elliot asked Dunlap to drive himself, Bellon, and Benzo to the club. Dunlap reluctantly agreed. Dunlap drove the vehicle, with Benzo in the front passenger seat beside Dunlap, Elliot in the backseat behind Benzo, and Bellon in the backseat behind Dunlap. According to Benzo, Dunlap had his gun with him when he got into the car.

According to Elliot's testimony at trial, as Dunlap backed up he saw someone and asked if it was an individual named "Trim." Elliot looked out the rear view mirror and replied that it was not "Trim." At that exact time, Bellon handed Elliot a bottle of alcohol, and as Elliot checked to see if the individual was "Trim," he heard a loud pop. Elliot looked over, saw Bellon hunched over Dunlap, and heard another pop. Following the gunshots, Elliot and Benzo exited the vehicle and began to run away. As they ran, Elliot heard Bellon suggest that they take the car.

Crosby testified at trial that he had seen Bellon, Dunlap, Elliot, and Benzo in his apartment when they were getting ready to go to the Crazy Horse club. He said that shortly after the group left, Elliot returned to their apartment and told him that Bellon had shot Dunlap. Crosby testified that Elliot told him that as the car backed out of the parking lot, Bellon grabbed the back of Dunlap's head, around his neck, and shot him twice.

Benzo testified at the trial. Benzo did not recall telling Elliot about Dunlap and Bellon shooting their weapons on a ride to the store. After reading his statement and refreshing his memory, Benzo recalled telling police that Bellon had a chrome .380 and Dunlap had a 9mm. Benzo recalled that Dunlap was giving Bellon, Elliot, and himself a ride to the Crazy Horse. He sat in the front passenger seat, Elliot sat behind him, and Bellon sat behind Dunlap, who was driving the car. He said that Dunlap had his gun with him when he got into the car. He remembered Dunlap asking about another vehicle. Benzo testified that next he heard gunshots and saw a gun in Dunlap's left hand, pointed out the window. Benzo said that he heard the shots but did not see the shooting. At that point, he jumped out of the car and ran toward Elliot's house. He did not know anyone had died as a result of the shooting until he saw it on the news the next morning.

The first officer to arrive at the scene of the murder found a male slumped behind the wheel of a car. Police searched the vehicle and found a spent .380 casing on the floorboard of the vehicle,

an empty holster for a large-frame handgun, a bullet fragment, and a 40-ounce malt liquor bottle.

Police also recovered Dunlap's wallet, which contained a gun registration card for a 9mm Taurus, model PT92AF, with the serial number TND70395. The police did not recover a firearm or watch from the scene. Elliot's fingerprints were found on the vehicle's exterior passenger window and door, and Bellon's fingerprint was found on the back of a bottle of Old English 800. In July 2002, the police examined and retested the bullet fragment found at the scene. A firearms examiner testified that the bullet fragment is consistent with a .380 automatic and could have been fired from guns produced by several manufacturers but not from a 9mm Taurus.

Dr. Giles Green of the Clark County Coroner's Office performed the autopsy on Dunlap. Dr. Green testified that Dunlap had been shot twice, once in the neck and once in the back, and that the shot in the back caused Dunlap's death. According to Dr. Green, Dunlap's wounds were inflicted at close range and were consistent with a .380 caliber weapon. Dr. Green concluded that Dunlap's death was most probably a homicide. When questioned whether the death could have been accidental, Green replied that "one shot I can buy for an accident one in a thousand times, but not two."

Lerry Dowell testified that he had known Bellon when he lived in Las Vegas, Nevada. In October 1995, Dowell moved to Lake Charles, Louisiana, and in August 1996, almost one year after the shooting, Bellon visited Dowell in Louisiana. In early 1997, Bellon told Dowell about the shooting and showed him a 9mm Taurus handgun. Bellon told Dowell that he accidentally shot another man when the two had exchanged guns. He said the gun he was holding discharged because the vehicle hit a speed bump in the road. Bellon asked if he could use Dowell's identity. Dowell agreed and gave Bellon his Social Security card and birth certificate. Dowell testified that Bellon had identification bearing Dowell's name, but Bellon's picture.

More than three years after the shooting, on November 20, 1998, Bellon was taken into custody in Lake Charles, Louisiana, on unrelated charges. Initially, Bellon gave officers several identities before finally revealing his true identity. At that point, officers in the Calcasieu Parish Sheriff's Office discovered that Bellon had outstanding arrest warrants in the State of Nevada, including one for Dunlap's homicide.

As a result, the sheriff's office conducted an investigation. Bellon consented to a search of both of his residences in Lake Charles, Louisiana. When asked if the officers would find anything pertaining to the Nevada investigation, Bellon replied, "Like the

murder weapon or something like that?'' In reply the officers said, ''a murder weapon, anything that would pertain to that case.'' Detective David Judice testified that Bellon ''posed a question to me, pardon me, if I thought he was that fucking stupid to bring something like that down to Louisiana.'' Detective Leslie Blanchard testified that the officers searched two residences, Bellon's own and that of his father, and found 9mm ammunition at his father's house, as well as Lerry Dowell's Social Security card and birth certificate and contact information for Benzo.

In May 1999, in an event entirely unrelated to Bellon, Detective Michael Brady, an officer of the Calcasieu Parish Sheriff's Office, responded to a call involving a fight at a hotel. Detective Brady arrested several individuals attempting to flee the scene in a car and recovered a 9mm Taurus handgun, which bore the serial number of Dunlap's gun.

After Bellon's arrest, officers arrested Bellon's pregnant girlfriend, Carleen Holland, on charges of accessory after the fact to the murder, and agreed to release her and drop the charges against her if Bellon agreed to waive extradition. Apparently, after Holland's arrest, Bellon made a series of threatening statements to Detectives Judice and Blanchard concerning Bellon's waiver of extradition.

At trial, during the opening statement, the prosecutor stated:

> During that time period, he's visited by Detective Blanchard and Judice. There's discussions between Detective Blanchard and Judice that you're going to hear about. The defendant tells them, ''Hey, this isn't Lake Charles, this is Vegas. They have a murder all the time in Vegas. I'm going to do a couple of years on the murder. But when I get out, because you guys caught me, I'm going to come back.''

Defense counsel objected, and a bench conference was held off the record. The district court overruled the objection and allowed counsel to make his objection on the record. Defense counsel argued that any possible testimony offered by the officers in relation to the threats constituted bad acts evidence not admissible under Nevada law and, in any event, the court was required to hold a *Petrocelli*[2] hearing.

The State, on the other hand, argued that the evidence was not offered pursuant to NRS 48.045, the prior bad act statute; rather, it was offered under NRS 48.035, the res gestae statute. The State contended that the statements fell within the res gestae doctrine because the statements were part of the complete story of the crime. Once again, the district court stated that it overruled Bellon's objection to the admission of the testimony.

---

[2]*Petrocelli v. State,* 101 Nev. 46, 692 P.2d 503 (1985).

As a result of this ruling, Detective Judice and Detective Blanchard testified about several conversations they had with Bellon. Detective Judice testified that on December 3, 1998, the officers had a discussion with Bellon concerning his extradition to Nevada. Detective Judice gave the following testimony:

> Q: And did the defendant tell you anything of what he was going to do if and when he ever got back from Las Vegas?
>
> A: Yeah, he made it clear that he would return to Lake Charles.
>
> Q: And what did he say he would do?
>
> A: He was going to find my family, my children, as well as Detective Blanchard's. He would kill us and when we found our children, we'd be able to bury them.

The following day, on December 4, 1998, the officers had another discussion with Bellon about his extradition. Detective Judice testified that Bellon said that ''[h]e changed his mind. He had decided that he wouldn't come after me, he'd go ahead and make me suffer and he'd just go after my family.''

Detective Blanchard also testified about the events surrounding Bellon's arrest in Lake Charles, Louisiana. Detective Blanchard testified that when he and Detective Judice transported Bellon back to the sheriff's office after searching his residences, he asked Bellon what sentence he thought he would receive on the charge and Bellon replied, ''They'll probably give me about 20 years. They'll offer me a plea bargain for second degree murder and tell me that I don't have to face the death penalty.''

Detective Blanchard testified that he participated in the negotiations with Bellon concerning his waiver of extradition. Detective Blanchard stated:

> When we were walking back to the jail, he commented that Lake Charles is nothing like Vegas because Vegas has homicides every day and that he'd see daylight again. And he said that he would come back for—I called him Junior—Detective Judice is referred to as Junior. He commented to Detective Judice and I that he's [sic] come back for us whenever he got out. And after that, he said, ''No actually, I'm going to come back, I'm going to get you good.'' He said, ''I'll get your kids.'' He said, ''So, when they disappear off a playground, and you find them, you can bury them.''

On cross-examination Detective Blanchard offered the following testimony concerning the nature of the statements:

> Q: He made the comments to you with regards to your family.
>
> A: That is correct.

Q: When you refused to release his pregnant girlfriend, correct?

A: That is correct.

Q: That was along the lines of, ''How would you like your family to be treated this way?''

A: No, it was along the lines of, ''I will be released. And whenever I get out, I will make you pay for catching me.''

The district court gave the following instruction after the officers testified:

You have heard evidence of other uncharged acts or crimes. Such evidence may only be considered by you as it relates to the elements of the crime charged. You may not consider such evidence for any other purpose including to prove the character of a person in order to show that he acted in conformity therewith.

Additionally, the district court provided an identical instruction when the jury was charged.

## DISCUSSION

Bellon argues that the statements he made to Louisiana police officers, which included threats to them and their families, should not have been admitted at trial. At trial the State contended that the evidence was admissible under NRS 48.035(3),[3] the res gestae statute. The State argued that the detectives' testimony was necessary for them to tell the complete story of the crime. Now, on appeal, the State does not rely on NRS 48.035(3). Instead, the State contends that the evidence was admissible under NRS 48.045(2), which permits the admission of prior bad acts for limited purposes, such as to show consciousness of guilt.[4] We note that this court has previously upheld the decision of a trial court if the court reached the right result even though it was based upon incorrect grounds.[5]

---

[3]NRS 48.035(3) provides:

Evidence of another act or crime which is so closely related to an act in controversy or a crime charged that an ordinary witness cannot describe the act in controversy or the crime charged without referring to the other act or crime shall not be excluded, but at the request of an interested party, a cautionary instruction shall be given explaining the reason for its admission.

[4]See Santillanes v. State, 104 Nev. 699, 701, 765 P.2d 1147, 1148 (1988) (holding that evidence which shows consciousness of guilt is admissible).

[5]Wyatt v. State, 86 Nev. 294, 298, 468 P.2d 338, 341 (1970) (''If a judgment or order of a trial court reaches the right result, although it is based on an incorrect ground, the judgment or order will be affirmed on appeal.'').

While recognizing the validity of that premise, we now hold that in the limited circumstance where the State has argued that evidence is admissible as res gestae at trial, and specifically repudiated the admissibility of the evidence under NRS 48.045 thereby circumventing the requirement for a *Petrocelli* hearing as required under Nevada law, the State is not permitted to abandon that argument on appeal and assert the admissibility of the evidence under NRS 48.045(2). In any event, we also conclude that the officers' testimony was not admissible under either the res gestae statute or to show consciousness of guilt under NRS 48.045(2).

▃▃▃▃▃▃

The State may present a full and accurate account of the crime, and such evidence is admissible even if it implicates the defendant in the commission of other uncharged acts.[6] However, the "complete story of the crime" doctrine must be construed narrowly.[7] Accordingly, we have stated that "the crime must be so interconnected to the act in question that a witness cannot describe the act in controversy without referring to the other crime."[8] We now reiterate that admission of evidence under NRS 48.035(3) is limited to the statute's express provisions. Under the statute, a witness may only testify to another uncharged act or crime if it is so closely related to the act in controversy that the witness cannot describe the act without referring to the other uncharged act or crime.

In the instant case, we conclude that the State could introduce evidence of Bellon's flight to Louisiana without referring to the threats he made against Detective Judice and Detective Blanchard. These threats were not so interconnected with the events surrounding Dunlap's murder or Bellon's flight and subsequent arrest that the detectives could not testify without mentioning the threats. To the contrary, the State could have easily presented testimony concerning the statements Bellon made about the murder weapon, the sentence he might receive in Las Vegas, and the evidence the police obtained after his arrest without referring to the threats he made during the negotiations to obtain a waiver of extradition.

▃▃▃▃▃▃

We also conclude that the threats are not sufficient to demonstrate consciousness of guilt. We have previously noted that "[d]eclarations made after the commission of the crime which indicate consciousness of guilt, or are inconsistent with innocence, or tend to establish intent may be admissible."[9] In this instance, the threats

---

[6]*Bletcher v. State,* 111 Nev. 1477, 1480, 907 P.2d 978, 980 (1995).

[7]*Tabish v. State,* 119 Nev. 293, 307, 72 P.3d 584, 593 (2003).

[8]*Bletcher,* 111 Nev. at 1480, 907 P.2d at 980.

[9]*Abram v. State,* 95 Nev. 352, 356, 594 P.2d 1143, 1145 (1979).

Bellon made against the officers are more reflective of his frustration at being arrested than demonstrative of his consciousness of guilt. Additionally, Bellon did not threaten the officers to discourage them from testifying. Moreover, the district court could have admitted the evidence concerning Bellon's flight to Louisiana without referencing the extraordinarily prejudicial statements about the threats he made against the officers. Therefore, we conclude that the statements are not admissible under NRS 48.045(2).

We have previously delineated the considerations that are relevant to determine whether the erroneous admission of evidence constitutes harmless error.[10] Those considerations include "whether the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged."[11] In this case, we cannot say that these considerations weigh in favor of a conclusion that the district court's error was harmless. Bellon was charged with the most serious of offenses, first-degree murder. Significantly, the inadmissible evidence is extremely prejudicial and was of minimal probative value in terms of providing evidence that Bellon committed the murder for which he was charged. While we acknowledge that substantial evidence supports Bellon's conviction and is sufficient to convict Bellon in the absence of any error, we conclude that the gravity of the error was sufficient to deprive Bellon of his right to a fair trial considering the prejudicial nature of the testimony regarding the threats Bellon made toward the police officers and their families. Accordingly, we conclude that the judgment of conviction must be reversed.

## CONCLUSION

We conclude that the district court committed reversible error in admitting evidence of other uncharged acts or crimes under either the res gestae statute or under NRS 48.045(2). We also conclude that such error was not harmless. Accordingly, we reverse and remand this case to the district court for a new trial.

---

[10]*Big Pond v. State*, 101 Nev. 1, 3, 692 P.2d 1288, 1289 (1985).

[11]*Id.*