JOHN VERNON FIELDS, APPELLANT, *v.*
THE STATE OF NEVADA, RESPONDENT.

No. 50497

December 10, 2009 220 P.3d 709

[Rehearing denied February 16, 2010]

*Frederick B. Lee Jr.*, Public Defender, and *Roger H. Stewart*, Deputy Public Defender, Elko County, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *Gary D. Woodbury*, District Attorney, and *Troy C. Jordan*, Deputy District Attorney, Elko County, for Respondent.

## OPINION

By the Court, PICKERING, J.:

This is an appeal from a judgment of conviction of first-degree murder with the use of a deadly weapon and conspiracy to commit murder, asserting evidentiary and instructional error and improper argument by the prosecutor. We find no error or abuse of discretion and therefore affirm.

### FACTS

A jury convicted John Vernon Fields (Fields) of murder and conspiracy to commit murder in connection with the death of Jaromir Palensky, whose fully clothed body was found floating in the Jordan River in Utah on January 14, 2004. Forensic evidence showed that Palensky had been dead for days, maybe weeks, and that he did not drown but died as a result of blunt force blows to the back of his head. Palensky did not have a car, current driver's license, or phone. He was last seen alive on December 19, 2003, at the ranch outside Elko leased by Fields and his wife, Linda Walker Fields (Linda). For the six weeks before he disappeared, Palensky had been living in a trailer on the ranch and working for the Fieldses as a ranch hand.

Palensky was an alcoholic. In 2002, he was convicted of DUI and sentenced to an 18-month prison term, which he had just finished serving when he moved into the trailer on the Fieldses' leased ranch. Linda befriended Palensky before he went to prison, and in late January of 2002, he gave her a general power of attorney. While Palensky was in prison, Linda used the power of attorney to liquidate a number of his assets, including two parcels of land, a savings account, a credit union account, and a pension plan benefit. Linda transferred these assets or their proceeds into joint accounts she held with Fields.

Some time after Palensky's body was discovered, a $300,000 life insurance policy naming Linda as Palensky's beneficiary surfaced, as did a handwritten will, naming Linda and Fields as the beneficiaries of Palensky's estate. The will recited that it had been written out for Palensky by a man named Sherman Butts, who died in 2004. Trial testimony established the writing wasn't that of Butts but a forgery by Fields.

Fields was tried separately from Linda, who was also charged with, and convicted of, murdering Palensky. In addition to first-degree murder and its lesser included offenses, Fields was charged with conspiring with Linda to murder Palensky ''for the purpose of acquiring money either through the payout of a life insurance policy on the victim, the beneficiary being Linda Walker Fields, the spouse

of the Defendant, or by acquiring the assets of the victim through a purported Will naming the Defendant and Linda Walker Fields, his spouse, as the primary beneficiaries.''

Fields defended the case on the basis that he didn't murder Palensky, someone else did—probably a stranger but perhaps Linda, in concert with the man she later had an affair with, or another friend or associate of hers. Even if Linda arranged Palensky's death, Fields argued, he still should be acquitted: the evidence did not show that he knew about the alleged scheme to murder Palensky; he was not named with Linda on Palensky's life insurance policy; and being married to Linda didn't mean that he conspired with her to kill Palensky.

## DISCUSSION

### Prior bad act evidence

Fields principally challenges the district court's admission of prior bad act evidence concerning the Fieldses' dealings with one Roy Mobert. Specifically, Fields challenges the district court's admission of: (1) testimony from Mobert's lawyer, Gregory Corn, and documents Corn authenticated, about the Fieldses' debts to Mobert and Mobert's foreclosure proceedings against them, which were imminent in December of 2003; and (2) a tape recording that captured Fields, Linda, and Billy Wells discussing a proposal for Wells to kill Mobert and make it look like an accident. The district court conducted a full *Petrocelli* hearing, *Petrocelli v. State*, 101 Nev. 46, 692 P.2d 503 (1985), and gave the jury the limiting instructions required by *Tavares v. State*, 117 Nev. 725, 30 P.3d 1128 (2001), before and after admitting this evidence. The issue thus is not process but, purely, admissibility.

"A district court's decision to admit or exclude [prior bad act] evidence under NRS 48.045(2) rests within its sound discretion and will not be reversed on appeal absent manifest error." *Ledbetter v. State*, 122 Nev. 252, 259, 129 P.3d 671, 676 (2006). Our already deferential review is even more limited than usual in this case. The parties did not include the trial exhibits—including the Corn documents and the Wells tape—in the record on appeal. And, although the Wells tape was played at trial, it was not transcribed.

As the appellant, Fields had the "responsibility to provide the materials necessary for this court's review." *Jacobs v. State*, 91 Nev. 155, 158, 532 P.2d 1034, 1036 (1975). Under NRAP 30(d), the required appendix should include "[c]opies of relevant and necessary exhibits," or "[i]f the exhibits are too large or otherwise incapable of being reproduced in the appendix, the parties may file a motion

requesting the Supreme Court to direct the district court clerk to transmit the original exhibits.'' Neither was done here. *See Thomas v. State*, 120 Nev. 37, 43 & n.4, 83 P.3d 818, 822 & n.4 (2004) (''Appellant has the ultimate responsibility to provide this court with 'portions of the record essential to determination of issues raised in appellant's appeal.' '' (quoting NRAP 30(b)(3)). While the Corn testimony and the pretrial and trial transcripts, which include the closing arguments, permit us to review the challenge to the Mobert evidence, not having the trial exhibits or a transcript of the Wells tape limits its scope.

## ■■■

NRS 48.045(2) prohibits the use of ''other crimes, wrongs or acts . . . to prove the character of a person in order to show that he acted in conformity therewith.'' Such evidence ''may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'' NRS 48.045(2). ''To be deemed an admissible bad act, the trial court must determine, outside the presence of the jury, that: (1) the incident is relevant to the crime charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.'' *Tinch v. State*, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997). In assessing ''unfair prejudice,'' this court reviews the use to which the evidence was actually put—whether, having been admitted for a permissible limited purpose, the evidence was presented or argued at trial for its forbidden tendency to prove propensity. *See Rosky v. State*, 121 Nev. 184, 197-98, 111 P.3d 690, 699 (2005). Also key is ''the nature and quantity of the evidence supporting the defendant's conviction beyond the prior act evidence itself.'' *Ledbetter*, 122 Nev. at 262 n.16, 129 P.3d at 678-79 n.16.

## ■■

The district court correctly found the Mobert evidence relevant to motive, intent, knowledge, and identity. Corn testified that, in November of 2003, the Fieldses had lost a three-year court battle with Mobert. Lying at the heart of the battle was the Fieldses' part interest in the Silver Dollar Bar in Elko, on which Mobert held a note secured by a deed of trust. Mobert was elderly and in ill health. Shortly before undergoing a hospital procedure in 2000, Mobert had given Linda a power of attorney and revised his will to include her and Fields as beneficiaries. Linda used the power of attorney to sell a bar Mobert owned in Jarbidge and to transfer the proceeds from that sale and money Mobert held in a brokerage account to accounts she and Fields jointly held. When Mobert recovered, he sued (and revoked his will), and the Fieldses countersued. To settle the suit, the Fieldses returned to Mobert what money of his they had left,

with a note secured by a deed of trust on the Silver Dollar Bar for the rest. The Fieldses defaulted on the note and in 2002, they filed bankruptcy to delay foreclosure. In November of 2003, shortly before Palensky disappeared, Mobert obtained an order lifting the bankruptcy court stay against foreclosure on the Silver Dollar Bar.

The taped conversation between the Fieldses and Billy Wells occurred in June of 2001, after the litigation with Mobert began. From the pretrial *Petrocelli* arguments, it appears the three discussed Wells arranging Mobert's death by having his car go over a cliff with Mobert in it. In return, the Fieldses would cancel a debt Wells owed them and pay Wells $1,000. Fields reportedly asks Wells on the tape whether a handshake would seal the agreement. The State argued that this conversation was similar to one Fields and Linda had with Palensky's fellow ranch hand, Ralph Mackley, not long before Palensky disappeared, in which Linda suggested, in Fields's presence, that Mackley run over Palensky with the front end loader and push his body into the river. An oddly jarring note: In the conversation with Wells and a later one with Mackley, Linda falsely accused Mobert and Palensky, respectively, of being child molesters, for no apparent reason except to devalue their worth as human beings.

The Corn testimony was properly admitted to establish that the Fieldses had a shared monetary motive to kill Palensky. The existence of their earlier litigation with Mobert, the debt owed on the Silver Dollar Bar, and the state of the bankruptcy lift-stay proceedings were not contested. In December of 2003, when Palensky disappeared, the Fieldses did not have enough money to pay their ranch hand, Mackley, and could no longer buy hay on credit. The Fieldses stood to lose their interest in the Silver Dollar Bar unless they immediately paid Mobert a significant sum of money. Linda receiving Palensky's $300,000 life insurance benefit, or the two of them inheriting his estate, would help solve their problem with Mobert. It would also eliminate the brewing dispute they faced with Palensky over the asset transfers Linda had made while Palensky was in prison.[1]

A similar issue came before the court in *Felder v. State*, 107 Nev. 237, 810 P.2d 755 (1991). Felder, like Fields, appealed his murder conviction on the basis that the State violated the rule against using bad act evidence to prove criminal propensity by introducing evidence of the defendant's ''desperat[e]'' financial condition to establish motive and identity. *Id.* at 241, 810 P.2d at 757. The evidence Felder challenged showed he ''was in financial distress and took

---

[1]Although she denied making the statement at trial, Linda's daughter told her uncle, Mike Walker, that her parents, Linda and Fields, were arguing with Palensky over money the night before he disappeared. The daughter's statement to her uncle was admitted as a prior inconsistent statement at trial.

money from bank accounts without permission, forged signatures to obtain credit cards, and wrote a large check to his attorney, which bounced," in the eight months preceding the murder. *Id.* at 240, 810 P.2d at 757. This evidence had multiple implications, some legitimate and others forbidden by NRS 48.045(2). Although it impugned Felder's character, the evidence was also relevant to establish that Felder was in financial straits and invented a ransom demand after killing the victim as part of a scheme to obtain $100,000 from a third person. Felder argued that the forgery and unauthorized transfers from other people's bank accounts should have been excluded as improper bad act evidence under NRS 48.045(2); the State countered that "the testimony was needed to demonstrate motive and that the prior acts were closely connected to Felder's apparent scheme to obtain ransom money." *Felder*, 107 Nev. at 240, 810 P.2d at 757.[2] The court agreed with the State and held the unauthorized bank account transfers and forgery "may indicate desperation and [were] therefore properly admitted to prove motive." *Id.* at 241, 810 P.2d at 757.

Not only did it tend to establish financial motive, as in *Felder*, the Mobert evidence also had relevance to knowledge and intent. It tended to show that Fields was not an innocent or ignorant bystander to Linda's alleged murderous scheme, as he claimed. A defendant's knowing participation in prior bad acts with alleged coconspirators may be admitted in a proper case to refute claims that the defendant's acts were "nothing more than innocent acts of a friend [or here, a husband], and not a knowing participation in a conspiracy," and to show that "[d]efendant was not an innocent pawn taken by surprise" in the conspiracy charged. *United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009) (Calabresi, J.) (applying Fed. R. Evid. 404(b), the counterpart to NRS 48.045(2), and Fed. R. Evid. 403). *See United States v. Tse*, 375 F.3d 148, 155-56 (1st Cir. 2004) (canvassing and applying cases holding that, "[i]n a conspiracy case, the district court may admit evidence of other bad acts if they tend to suggest a criminal association between the alleged conspirators . . . [and to] rebut a defendant's claim that his association with the alleged conspirators was innocent"); *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) (noting that, "One legitimate purpose for presenting evidence of extrinsic [prior bad] acts is to explain how a criminal relationship developed; this sort of proof [can] furnish[ ] admissible background information in a conspiracy case . . . [and] help the jury understand the basis for the co-

---

[2]The evidence respecting the bounced check to Felder's lawyer was inadmissible hearsay, but its admission did not constitute reversible error because it was cumulative. *Felder*, 107 Nev. at 242, 810 P.2d at 758.

conspirators' relationship of mutual trust"); *United States v. Cross*, 308 F.3d 308, 322 (3d Cir. 2002) (upholding admission of evidence of other bad acts to refute claims that the defendants acted unwittingly and in good faith in connection with the events giving rise to the conspiracy charged); *cf. Homick v. State*, 108 Nev. 127, 139, 825 P.2d 600, 608 (1992) (upholding admission of testimony about prior bad acts to explain the relationship that led the defendant to give the murder weapon to an associate to use to commit another crime).

Last, the Mobert evidence tended to prove identity, a central disputed issue in this case. " '[E]vidence of prior criminal behavior may only be admitted to prove identity when its prejudicial effect is outweighed by the evidence's probative value *and* when that prior behavior demonstrates characteristics of conduct which are unique and common to both the defendant and the perpetrator whose identity is in question.' " *Canada v. State*, 104 Nev. 288, 292-93, 756 P.2d 552, 554 (1988) (quoting *Coty v. State*, 97 Nev. 243, 244, 627 P.2d 407, 408 (1981)). The district court did not abuse its discretion when it found the Mobert and Palensky facts sufficiently similar to permit the Mobert evidence to be used to show identity. Both scenarios involved grifting an older man (Palensky was in his sixties, Mobert in his seventies) who, facing loss of control of his life through hospitalization or prison, gave Linda a power of attorney, which she then used to transfer assets into accounts held by her and Fields; when the man recovered his autonomy and protested his missing money and property, Linda and Fields spoke to third parties about arranging the man's death, making it look accidental; she even went so far, in Fields's presence, as to falsely accuse each man of being a child molester, in conversation with their prospective killers.

The fact the Mobert solicitation did not lead to his death, while Palensky ended up murdered, weakens but does not eliminate the probative worth of the Mobert evidence. *United States v. Robinson*, 177 F.3d 643 (7th Cir. 1999), is analogous. Robinson challenged the admission to prove identity of a conversation he had with his girlfriend months before the bank robbery he was accused of. In it, he asked her to help him rob a different bank and outlined his thoughts on how to accomplish this. According to Robinson, this conversation showed only "the daydreams of a frustrated youth" and was too dissimilar from the robbery charged to be admitted. 177 F.3d at 647. Writing for the panel, Judge Wood found "no error, plain or otherwise" in admitting the girlfriend's testimony. *Id.* Whether or not the "daydream" and the robbery shared a common "modus operandi," they were similar enough "to show that Robinson had developed a plan for robbing a bank that he believed could be carried out quickly

and easily. . . . It also supplies a motive for bank robbery: Robinson thought this was a quick and easy way to solve his financial problems.'' *Id.*

In sum, the Mobert evidence had probative value on issues besides propensity—motive, intent, knowledge, and identity—which satisfies the first prong of *Tinch*'s three-part test. Although the dissent argues otherwise, the facts relating to Mobert were sufficiently proved to satisfy *Tinch*'s second prong as well. The Corn testimony, as noted, addressed the fact of the Fieldses' dispute with Mobert and Mobert's imminent foreclosure of their interest in the Silver Dollar Bar. And as the district court found, the Wells ''tape is what the tape is.'' It was properly authenticated. The jury did not have to believe or like Wells. *See Wade v. State*, 114 Nev. 914, 917-18, 966 P.2d 160, 162-63 (1998) (upholding admission of tape-recorded conversation with an informant for the defendant's statements, not the informant's). Its significance lay in what Fields and Linda said on the tape. Whether they meant their words seriously was for the jury to decide. The words themselves were not contested.

The close question arises under *Tinch*'s third prong, in the district court's determination that the risk of unfair prejudice did not substantially outweigh the probative value of the evidence. On the record we have, we cannot say that the district court manifestly abused its discretion in deciding this question, especially in view of the fact that the State charged Fields with conspiracy to commit murder. The court gave proper limiting instructions, and the State did not offer or argue the evidence to prove propensity. Presenting the Mobert evidence took less than a half day of the two-week trial in this case. We do not have a transcript of opening statements, but the transcript of closing arguments shows that the State did not put the Mobert evidence to improper use. In closing, the State made minimal mention of the Mobert evidence, addressing it once, briefly, in regard to the Fieldses' financial straits and the financial motive their problems with Mobert gave them to kill Palensky, and a second time addressing the conspiracy charge against Fields.[3] Finally, we have carefully reviewed the record and find there was sufficient proof, independent of the Mobert evidence, to convict Fields of both murder and conspiracy to commit murder, given the forged will, Fields's statements to Mike Wilson, Mike Walker, and others about Palensky's death and ''dump[ing] the body,'' his taped inculpatory conversations with Linda from the jail, and the Fieldses' impending

[3]The State did not argue that the Fieldses had a motive to kill Palensky because he allegedly molested Linda's grandson. On the contrary, the State argued that Linda's statements about Palensky being a child molester were trumped up and that Linda had made similar false accusations against Mobert to discredit and devalue both men.

dispute with Palensky over his missing money and property. On this record, we therefore reject Fields's NRS 48.045(2) challenge to the admission of the Mobert evidence.

*Excluded testimony*

Next, Fields challenges the district court's exclusion of testimony from two witnesses, Wilson and Grondona, about statements non-testifying third parties made to them concerning Linda's brother, Mike Walker. We review a district court's determination of whether proffered evidence fits an exception to the hearsay rule for abuse of discretion. *See Harkins v. State*, 122 Nev. 974, 980, 143 P.3d 706, 709 (2006).

Fields sought to establish through Mike Wilson that Wilson once found Linda crying, covered in blood from a head wound for which she blamed her brother, Mike Walker, "not that Mike Walker did it, but it was tied to Mike Walker, to people tied to an act of his." Walker testified at Fields's trial about a conversation he overheard between Fields and Linda about Palensky's life insurance benefit being paid into court and their fear of what would happen "if they find out we dumped the body." Walker was impeached with a prior conviction and other bases for bias against his sister, but he was not asked about the episode sought to be introduced through Wilson. The district court properly excluded Wilson's testimony about Linda's accusations against her brother as improper collateral impeachment of a witness under NRS 50.085(3).

The Claire Grondona testimony was the subject of an offer of proof outside the jury's presence. Grondona testified that she is a former reserve police officer, currently working as a Catholic lay minister and helping rehabilitate drug abusers. In July of 2007, a woman named Leah Rand came to Grondona's home and broke down in tears describing how, in 2003, she had come to Nevada from California with a group of people, including Mike Walker, gotten drunk, and seen Walker hit "Jerry . . . the Polack" in the head with an object. Rand said she did not report this to the police then or later, because in the summer of 2004, Walker threatened to kill her and her children. Nor did Grondona report her conversation with Rand to anyone until Grondona testified at the Fields trial. Rand was not shown to be unavailable; her statements to Grondona thus did not even arguably qualify for admission as statements against penal interest. NRS 51.345(1)(b). They also did not qualify as excited utterances, given that more than three years elapsed between the event and her telling Grondona about it. *See Browne v. State*, 113 Nev. 305, 313, 933 P.2d 187, 192 (1997) (noting that "the timing of the event precipitating [the declarant's] fear . . . is

often the determining factor for an excited utterance''). The district court did not abuse its discretion in excluding the Grondona/Rand evidence as hearsay.

Citing *Chia v. Cambra*, 360 F.3d 997 (9th Cir. 2004), Fields argues he had a due process right to present Grondona's testimony because, if accepted as true, Rand's statements to Grondona exonerated him by implicating Walker. Fields overreads *Chia*. Relying on *Chambers v. Mississippi*, 410 U.S. 284 (1973), *Chia* held that ''when a hearsay statement bears persuasive assurances of trustworthiness and is critical to the defense, the exclusion of that statement may rise to the level of a due process violation.'' *Id.* at 1003. Rand's statements to Grondona, unlike the declarant's statements in *Chia*, bore no particular indicia of trustworthiness. To the contrary, according to Grondona, Rand said she was drunk when the fight she witnessed occurred; both Grondona and Rand reportedly had a prior history of bad blood with Walker, giving them motive to falsely inculpate Walker. Unlike the declarant in *Chia*, whose statements to detectives were recorded and close in time to the event (one was made as the declarant was being prepared for surgery and under fear of impending death), Rand's statements to Grondona were made more than three years after the event. Most important of all, the declarant's statements in *Chia* inculpated the declarant while exonerating the defendant, thus contributing to their reliability. The statements at issue here, by contrast, did not inculpate the declarant (Rand) but merely placed her at the scene as a witness against a third person (Walker). With no assurances of trustworthiness, *Chia* does not apply. *Id.* at 1008.

''Although a criminal defendant has a due process right to 'introduce into evidence any testimony or documentation which would tend to prove the defendant's theory of the case,' that right is subject to the rules of evidence.'' *Rose v. State*, 123 Nev. 194, 205 n.18, 163 P.3d 408, 416 n.18 (2007) (quoting *Vipperman v. State*, 96 Nev. 592, 596, 614 P.2d 532, 534 (1980)). Grondona's testimony about what Rand said to her did not carry sufficient assurances of trustworthiness to justify admission despite its hearsay status.

*Jail telephone conversations*

Fields spoke to Linda on the telephone while she was in jail and their conversations were recorded. Although the record on appeal includes neither the tape recordings nor transcripts of the calls played for the jury, the pretrial hearing transcript establishes that both

Linda, as the inmate, and Fields, as the outside caller, would automatically be warned that the call was being recorded. This defeats the expectation of confidentiality required to sustain Fields's claim of marital privilege under NRS 49.295 for these calls. *Foss v. State*, 92 Nev. 163, 167-68, 547 P.2d 688, 691 (1976).

## Jury instruction on intent

Fields next complains that the jury instruction on specific intent was inadequate because the court did not add the following underscored language to its instructions that "murder is a specific intent crime" and that "[s]pecific intent means the intent or active desire to accomplish a precise act or forbidden objective, *not merely the intent to do an act*." However, in addition to the instructions just quoted, the jury was instructed that, "[b]ecause murder is a specific intent crime, the Defendant cannot be found guilty of murder merely because it was a natural and probable consequence of the conspiracy unless he had a specific intent to commit the murder," that "[m]urder in the first degree" must be perpetrated by means of "willful, deliberate and premeditated killing," and that "[w]illfulness is the intent to kill." This adequately conveyed the information Fields sought to add to the specific intent instruction. *See Powell v. State*, 113 Nev. 258, 262-63, 934 P.2d 224, 227 (1997).

## Comment in closing argument

When Linda spoke to Fields on the jail phone, she apparently complained to Fields that she was in jail because of what Fields did. During closing, the State commented on Fields's silence in the face of these accusations. Fields objected and the court sustained his objection to the extent this could be interpreted as a comment on Fields's not testifying. The court overruled his objection to the extent Fields's silence on the accusatory calls with Linda were adoptive admissions. While the State's comment should have been more narrowly tailored, this ruling comported with *Maginnis v. State*, 93 Nev. 173, 561 P.2d 922 (1977), and does not constitute reversible error.

## CONCLUSION

Fields was charged with and convicted of both murder and conspiracy to commit murder. The district court did not abuse its discretion in making the evidentiary rulings it did or commit instructional error. Accordingly, we affirm.

HARDESTY, C.J., PARRAGUIRRE, DOUGLAS, and GIBBONS, JJ., concur.

CHERRY, J., with whom SAITTA, J., agrees, dissenting:

I respectfully dissent from my colleagues in the majority. As a former public defender, special public defender, and a trial judge, I fear that the majority's reasoning in affirming the murder conviction of appellant emasculates NRS 48.045. I hope that our trial judges in the State of Nevada will continue to follow the general rule that "proof of a distinct independent offense is inadmissible" during a criminal trial, *Nester v. State of Nevada*, 75 Nev. 41, 46, 334 P.2d 524, 526 (1959), and only permit the introduction of said prior bad act evidence if the trial court determines that: "(1) the incident is relevant to the crime charged, (2) the act is proven by clear and convincing evidence, and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." *Tinch v. State*, 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997).

In the instant matter, John Vernon Fields was convicted of one count of first-degree murder with the use of a deadly weapon and one count of conspiracy to commit murder. He now appeals those convictions primarily on the basis of the district court's admission of evidence of a prior bad act in the form of a prior uncharged conspiracy. Fields argues that such evidence was inadmissible for two reasons. First, Fields contends that the evidence did not fall within the common-plan-or-scheme exception to the general rule excluding bad act evidence because the crime charged was not similar enough to the prior conspiracy. Second, Fields contends that even if the bad act evidence was relevant as proof of a common plan or scheme, such evidence should not have been admitted because its probative value was substantially outweighed by the danger of unfair prejudice.

I conclude that the district court abused its discretion in admitting this bad act evidence because the prior conspiracy was not similar enough to the crimes charged to be relevant as proof of a common plan or scheme. I also conclude that the probative value of the bad act evidence was substantially outweighed by the danger of unfair prejudice. As such, I conclude that a new trial is warranted because the admission of the bad act evidence was not harmless.

## FACTS

### Relationship between the Fieldses and Palensky

In April 2002, Jaromir Palensky went to prison for a felony DUI conviction. Prior to going to prison, Palensky contacted Linda Marie Walker Fields (Linda) and gave her power of attorney so she could take care of his affairs while he was in prison. In addition, Linda took out a new life insurance policy on Palensky's life with Linda as the beneficiary.

More than a year after his conviction, Palensky completed his term of incarceration. Approximately three months before his re-

lease, the Nevada Division of Parole and Probation contacted Linda to organize Palensky's early release. After meeting with Palensky's parole officer, Fields and Linda arranged to move Palensky's trailer onto their property. Palensky then worked and lived on the Fieldses' ranch until his disappearance in December 2003. The Fieldses alleged that, prior to his disappearance, Palensky made a will that made the Fieldses his heirs.

A month after Palensky's disappearance, on January 14, 2004, his body was found floating face down in the Jordan River near Salt Lake City, Utah, by the Salt Lake County Sheriff's Department. Dr. Edward Leis, employed by the Utah State Medical Examiner's Office, performed an autopsy of Palensky's body and concluded that Palensky died of a combination of four blows to the back of his head inflicted by a blunt instrument. Dr. Leis testified that he could not be certain how long Palensky was in the water, but he could not deny that the body could have been in the water up to 24 days given the water temperature.

Detective Brent Adamson, a detective with the Salt Lake County Sheriff's office, was in charge of identifying Palensky's body and the subsequent investigation into Palensky's murder. Adamson did not receive any leads regarding Palensky's death. The only people to contact Adamson were people Palensky knew many years prior when he lived in Carbon County, Utah. In Palensky's wallet, there was a phone number for the Fieldses, which Adamson called. Fields answered, and told Adamson that Palensky was a former employee who left the ranch a month prior. Fields told Adamson to call Linda for more information. A few days after the phone call, Adamson traveled to Elko and to the Fieldses' ranch where he spoke to the Fieldses in person. Fields and Linda provided Adamson with all of Palensky's documents in their possession, including his trailer registration and the business documents between Linda and Palensky. Linda also provided Adamson with an agreement between her and Palensky in which Linda agreed to pay off five debts for Palensky. Fields was present when Linda gave this document to Adamson. Adamson and the Fieldses discussed that on December 19, 2003, Palensky was so intoxicated during work that the Fieldses had to send him to his trailer. Later that evening, lights were on in Palensky's trailer, but he was not there, and the Fieldses told Adamson that was the last time they saw Palensky. Adamson looked at Palensky's trailer but did not see anything suspicious. Kevin McKinney, a detective with the Elko County Sheriff's Department, began investigating Linda after he was contacted by her brother, Mike Walker, and her sister-in-law, Niqua Walker, in September 2006.

Mike and his wife, Niqua, moved onto the Fieldses' ranch in the summer of 2006. Prior to moving in with Linda, Mike was estranged from his sister for many years. Mike never met Palensky and

only heard the Fieldses discuss Palensky once—when they were going to Utah to receive money from the life insurance policy taken out by Linda on Palensky's life. Late one night when Mike got out of bed to go to the bathroom, he overheard a conversation between Fields and Linda wherein Fields said, "[w]hat if they find out we dumped the body." Linda reacted to Fields's statement with profanity and told Fields never to talk like that again. Thereafter, Mike and Niqua were evicted from the Fieldses' property for alleged drug use.

In late July 2006, Linda told Niqua that she caught Palensky molesting her grandson in the shed and that she killed Palensky by hitting him in the head with a pipe. Niqua discussed this admission with Mike, and they decided to alert the police. Fields was not around when Linda allegedly confessed to Niqua that she killed Palensky.

Mike and Niqua contacted McKinney with information that Linda was involved in Palensky's murder. They told McKinney about Linda's confession to Niqua, and that Linda stated that she used the insurance money from Palensky's death to pay his molestation victims. Niqua told McKinney she did not believe Linda because Linda lies a lot. Thereafter, McKinney inquired into the prior police investigation in Salt Lake City. In October 2006, McKinney and the Elko County Sheriff's Department took over as primary investigators on the Palensky murder, with McKinney as lead investigator. McKinney set up a confrontation between Mike and Linda on November 22, 2006, by putting a body wire on Mike and instructing him to confront the Fieldses about Palensky's murder. As soon as Mike entered the property, Fields told him to leave, and Mike left.

In November 2006, McKinney spoke to Fields at the sheriff's office regarding the death of Palensky. Fields told McKinney that he did not know about the death of Palensky but told McKinney that Patricia Grenz, a friend of the Fieldses, now owned the trailer Palensky lived in when he worked on the Fieldses' ranch. Grenz bought Palensky's trailer from its original owner after Palensky's disappearance. Thereafter, the police came to Grenz and took the trailer in which Palensky once lived in order to search it. The Fieldses also sold a red Toyota pickup to Grenz sometime before 2004. Previously, Mike and Niqua told McKinney that this pickup was used by the Fieldses to transport Palensky's body. McKinney conducted a search of Palensky's trailer and the red Toyota pickup. In each search, McKinney found no evidence related to Palensky's death.

After Linda was charged with open murder and convicted by a jury of murder in the first degree in the death of Palensky, Fields was separately charged with open murder and convicted of murder in the first degree with use of a deadly weapon and conspiracy to commit murder.

*Bad act evidence—Mobert conspiracy*

At trial, in an attempt to establish a possible motive linking Fields to Palensky's murder, the State introduced evidence of a prior uncharged conspiracy involving the Fieldses and Roy Mobert. Mobert and the Fieldses were friends who later developed a business partnership when Mobert assigned power of attorney to Linda. Mobert was elderly and in poor health, and Linda sold his property for him and arranged other affairs with the power of attorney. The business relationship soon soured, and the Fieldses filed a civil suit against Mobert, who filed a counterclaim. Mobert and the Fieldses settled this suit in 2000. Mobert died of natural causes in 2007, when Linda no longer held rights of survivorship or any other potential for pecuniary gain from Mobert.

At a hearing on pretrial motions in the instant case, the State put on Gregory Corn as its first witness. Corn was Mobert's attorney in the civil suit between Mobert and the Fieldses, wherein the Fieldses claimed that Mobert did not follow through on a promissory note to sell the Silver Dollar to them. However, Corn was not Mobert's attorney when Linda obtained power of attorney for Mobert. Corn testified that the Fieldses used Mobert's power of attorney "substantially" after Mobert inherited $95,000 from his mother. Corn also wrote a will for Mobert, revoking a prior will where Mobert left his entire estate to the Fieldses. The court ruled that the will could be admitted into evidence.

At the same pretrial hearing, the State called James Pitts, a detective with the Elko County Sheriff's Department. Pitts worked an investigation involving Fields, Linda, and Billy Wells, a regular police informant, after Wells told the police that the Fieldses had solicited him to murder Mobert. In 2001, Pitts rigged Wells with a microphone and instructed him to meet with Fields and Linda about the possible murder for hire in an attempt to record Fields and Linda soliciting Wells to murder Mobert. Consequently, the State sought to admit the recorded conversations under the motive exception to hearsay because it showed Fields's involvement in a prior murder solicitation. Fields objected to the admission of the tape on the basis of relevancy and prejudicial value. The court ruled that it would admit the tape at trial with a cautionary instruction.

Before Corn testified at trial, a limiting instruction pursuant to *Tavares v. State*[1] was given regarding the bad act evidence to be given by Corn and Pitts. At trial, Corn testified that Linda sold Mobert's bar in Jarbidge, Nevada, and that she took the proceeds

---

[1]117 Nev. 725, 733, 30 P.3d 1128, 1133 (2001) (stating that the trial court, absent a waiver from the defendant, must give a limiting instruction explaining the purposes for which bad act evidence is admitted immediately prior to its admission and a general instruction at the end of trial reminding the jurors that certain evidence may be used only for limited purposes).

from this sale, as well as proceeds from the sale of a house for Mobert, and opened a checking account in her own name. Linda then used this money to buy a vehicle for her daughter and to make improvements on the Silver Dollar. On behalf of Mobert, Corn prepared a counterclaim against the Fieldses, claiming that Linda defrauded Mobert and misused the power of attorney against Mobert. Eventually, the civil suit settled, and Corn testified that Fields returned ''substantial cash and property'' to Mobert.

Also at trial, and after the district court gave the *Tavares* instruction, Larry Kidd, Jr., a police officer with the City of Elko, testified that Wells told him that Wells had been contracted by the Fieldses to kill Mobert in 2001. Kidd helped Pitts set up Wells's audio surveillance to record the meeting between Wells and the Fieldses. After the investigation and audio surveillance, no charges were filed against Fields. Kidd testified that the audio surveillance failed to provide substantial evidence and that Wells was ''playing both ends against the middle,'' meaning that he was telling the police one thing and telling the Fieldses the opposite to evade suspicion from either side. Thereafter, excerpts from the conversation were played.[2] Wells was a paid informant for the narcotics task force, but there was no testimony regarding whether Wells was paid for this specific task. By introducing evidence of this uncharged prior conspiracy involving Mobert, the State sought to convey to the jury that with both Palensky and Mobert, the Fieldses, and John Fields in particular, planned to take advantage of elderly people by obtaining a power of attorney, using that power of attorney to get money and assets, and then murdering the elderly men for their estates.

Fields rebutted this testimony by not only pointing out Wells's propensity for untruthfulness but also the lack of physical evidence in the case. Specifically, Fields pointed out the State's inability to display a murder weapon or any evidence to suggest he was at the scene of Palensky's murder, as well as the inefficient investigation by the Elko County Sheriff's Department. After deliberating for three days, the jury returned a guilty verdict on all counts. The district court sentenced Fields and entered a judgment of conviction. This appeal followed.

## DISCUSSION

### Admission of bad act evidence

We defer to the district court's discretion in admitting or excluding evidence of prior bad acts. *Braunstein v. State*, 118 Nev. 68, 72, 40 P.3d 413, 416 (2002). We will not reverse such determinations absent manifest error. *Id.*

---

[2]The record did not contain the transcript of the tapes or excerpts of conversations that were played for the jury.

In analyzing the propriety of admitting evidence of prior bad acts, we have instructed trial courts to follow the parameters of NRS 48.045(2). *Id.* at 75, 40 P.3d at 418. Under NRS 48.045(2), such evidence is not admissible to prove the character of a person in order to show that he acted in conformity therewith but may be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Before admitting evidence of prior bad acts, the district court must, outside the presence of the jury, determine whether: (1) the evidence is relevant, (2) the prior bad act is proven by clear and convincing evidence, and (3) the danger of unfair prejudice substantially outweighs the evidence's probative value. *Meek v. State*, 112 Nev. 1288, 1292-93, 930 P.2d 1104, 1107 (1996). Here, although I focus on the relevance of the bad act evidence and whether its probative value is outweighed by unfair prejudice, I would hold that the State failed entirely in proving the bad act Mobert conspiracy by clear and convincing evidence.

### Relevance and the danger of unfair prejudice

Prior bad act evidence is admissible pursuant to the common-plan-or-scheme exception of NRS 48.045(2) when both the prior bad act evidence and the crime charged constitute "an 'integral part of an overarching plan explicitly conceived and executed by the defendant.' 'The test is not whether the other offense has certain elements in common with the crime charged, but whether it tends to establish a preconceived plan which resulted in the commission of that crime.'" *Ledbetter v. State*, 122 Nev. 252, 260-61, 129 P.3d 671, 677-78 (2006) (quoting *Rosky v. State*, 121 Nev. 184, 196, 111 P.3d 690, 698 (2005) (other internal citations and quotations omitted)).

I conclude that the evidence of an uncharged prior bad act admitted here—the Mobert conspiracy—was irrelevant because it was not part of a common plan or scheme when considered with the crimes charged because the State did not show that the two acts were part of an overarching, preconceived plan. As such, I conclude that the district court abused its discretion in admitting evidence of the prior uncharged bad acts alleged as the Mobert conspiracy for the reasons discussed below. There is a significant distinction between Mobert and Palensky. Mobert was in his late seventies, in poor health, and needed to have his affairs taken care of by another person at the time of the alleged conspiracy, whereas Palensky was in his sixties, in good health, and still had the strength to work on a ranch. The State portrayed to the jury that both of these victims were the same—elderly, frail, and helpless—when they were allegedly taken advantage of by the Fieldses. I conclude that this portrayal is inaccurate because the victims were not in the same circumstance

such that they could be considered similar enough to be part of a *preconceived plan*, as they were not the same age or in the same condition.

Mobert died in 2007 after there was a civil settlement approved by the court between him and the Fieldses—there was no ongoing dispute over money at the time of his death. Palensky was murdered, and there was no dispute with the Fieldses over money before his death. The circumstances of the alleged conspiracies are not similar, and the prior conspiracy alleged against Fields involving Mobert is irrelevant because the manner and cause of death of each of the victims are wholly different.

Mobert died of natural causes. The State failed to demonstrate that any alleged solicited murder of Mobert was relevant to proving a preconceived, overarching plan that resulted in the murder of Palensky. As such, I conclude that the district court abused its discretion by admitting the bad act evidence under the common-plan-or-scheme exception.

Even if the State had shown that the Mobert conspiracy was relevant to proving a common plan to conspire to murder Palensky, I conclude that the district court abused its discretion in admitting evidence of the Mobert conspiracy because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, and its admission led to serious jury confusion. Evidence of an alleged solicitation to murder Mobert from a police informant who even the police suggested was ''playing both ends against the middle,'' which belies the police's own trust in the informant, is not relevant and goes solely to a showing of bad character.

Furthermore, NRS 48.035(1) provides for the exclusion of evidence, even if relevant, if the probative value of that evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury. Here, I conclude that the district court abused its discretion in the admission of evidence of the Mobert conspiracy because it was more prejudicial than probative and it led to serious jury confusion. A significant amount of time at trial was spent playing the excerpts of the conversations between Fields, Linda, and Wells related to the alleged Mobert conspiracy, as well as presenting Corn's testimony regarding the civil suit between the Fieldses and Mobert. Explaining every aspect of a civil suit within a criminal prosecution is potentially confusing to the jury because the standards and evidence are very different. The alleged conspiracies were not sufficiently similar for the Mobert conspiracy to be admitted under the common-plan-or-scheme exception. Because the Mobert conspiracy is by all accounts a business deal gone wrong, although it was settled out of court, I conclude that the district court erred in allowing evidence of this conspiracy to be admitted in the underlying case because Wells was not a reliable in-

formant, the conspiracy was never charged, and the volume of information and time spent on submitting this conspiracy may have led to jury confusion.

### Prior bad act evidence confuses jurors

The majority bases part of its decision to affirm Fields's conviction on the fact that presentation of the Mobert conspiracy evidence took less than a half day of a two-week trial. As a criminal defense lawyer for almost three decades, I can attest that any mention of prior bad acts in a criminal trial cannot be analyzed by the time it took to present said evidence. Further, the presentation of this type of evidence can feel like a "lifetime" to a defense attorney and his or her client! Less than a half day of this type of evidence is certainly unfair. Limiting instructions are fine as well as not using prior bad acts to show "propensity." However, this type of evidence in the instant case could only confuse the jury, and any probative value, which I do not believe exists, is outweighed by its prejudicial effect.

Although I conclude that the district court abused its discretion in admitting this uncharged prior bad act evidence, a new trial is not warranted unless the error was not harmless.

### Harmless error

In reviewing nonconstitutional error, we use the standard set forth in *Kotteakos v. United States*, 328 U.S. 750 (1946), which is identical to NRS 178.598. *Tavares*, 117 Nev. at 732, 30 P.3d at 1132. "The test under *Kotteakos* is whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* (quoting *Kotteakos*, 328 U.S. at 776). Accordingly, unless it is clear that the defendant "suffered no prejudice as determined by the *Kotteakos* test, the conviction must be reversed." *Id.* (citing *United States v. Olano*, 507 U.S. 725, 741 (1993)).

I conclude that the district court's improper admission of the bad act evidence regarding the Mobert conspiracy was not harmless for two reasons. First, I conclude that the unfair prejudice Fields suffered from the admission of the bad act evidence substantially outweighed any probative value of such an admission because there is no direct evidence tying Fields to the murder of Palensky and the circumstantial evidence of guilt is less than overwhelming. Second, I conclude that the error in admitting the evidence certainly had a substantial and injurious influence in determining the jury's verdict because the alleged prior bad act was so serious and potentially confusing to the jury. Consequently, the error was not harmless because the unfair prejudice to Fields that resulted from the district court's error in admitting the bad act evidence substantially outweighed its probative value. Rather, the admission of the evidence regarding the Mobert conspiracy—evidence of an alleged prior murder solicitation

by Fields—surely had an impact on the jury's verdict because even if the jury could not tie Fields to Palensky's murder, the guilty verdict rendered could have been determined, in part, by the admission of evidence of Fields's alleged solicitation to kill Mobert.

> *Stare decisis would cause the evidence of the Mobert conspiracy to be inadmissible*

The majority has successfully undermined the long line of cases and jurisprudence that has disallowed the use of prior bad acts by prosecutors. In *Phillips v. State*, 121 Nev. 591, 119 P.3d 711 (2005), *receded from on other grounds as stated in Cortinas v. State*, 124 Nev. 1013, 1026 n.52, 195 P.3d 315, 324 n.52 (2008), this court held that the probative value of defendant's prior convictions was outweighed by their prejudicial effect. *Id.* at 591, 119 P.3d at 711. In *Phillips*, admission of prior convictions, which met the burden of beyond a reasonable doubt, not merely clear and convincing evidence, were found to be error albeit harmless. *Id.* at 601-02, 119 P.3d at 718-19. Justice Rose, in his dissent, not only held the admission of prior bad act testimony to be error, but also that its presentation to the jury was not harmless beyond a reasonable doubt and therefore should have resulted in a reversal of the conviction. *Id.* at 603-04, 119 P.3d at 719-20 (ROSE, J., concurring in part and dissenting in part).

In reversing the first-degree murder conviction in *Longoria v. State*, 99 Nev. 754, 670 P.2d 939 (1983), this court held that the district court committed reversible error by permitting the prosecutor to cross-examine the defendant about his alleged commission of attempted murder in a prior incident. *Id.* at 756-57, 670 P.2d at 940-41. The rationale of *Longoria* is applicable in the instant case since, in both cases, the evidence was not overwhelming and the jury may have reached a different conclusion if the error had not occurred. *See also Bellon v. State*, 121 Nev. 436, 117 P.3d 176 (2005); *Walker v. State*, 116 Nev. 442, 997 P.2d 803 (2000); *Roever v. State*, 114 Nev. 867, 963 P.2d 503 (1998); *Winiarz v. State*, 107 Nev. 812, 820 P.2d 1317 (1991).

## CONCLUSION

I conclude that the district court abused its discretion in admitting evidence of the Mobert conspiracy because the evidence was inadmissible prior bad act evidence that did not fall under the common-plan-or-scheme exception, and thus, was irrelevant. I further conclude that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. I further conclude the prior bad act was not proven by clear and convincing evidence. I conclude that a new trial is warranted because the admission of such evidence was not harmless—the confusing admission

of the tapes and the amount of time spent on discussing the alleged uncharged conspiracy surely had an impact on the verdict. Accordingly, I would reverse the judgment of conviction and remand this case to the district court for a new trial with the evidence of the Mobert conspiracy excluded.